# BRYAN *v.* ITASCA COUNTY, MINNESOTA

No. 75–5027.   Argued April 20, 1976—Decided June 14, 1976

374

BRENNAN, J., delivered the opinion for a unanimous Court.

*Bernard P. Becker* argued the cause for petitioner. With him on the brief were *Gerald L. Seck, Michael Hagedorn,* and *Daniel H. Israel.*

*C. H. Luther,* Deputy Attorney General of Minnesota, argued the cause for respondent. With him on the brief were *Warren Spannaus,* Attorney General, and *Paul R. Kempainen* and *Steven G. Thorne,* Special Assistant Attorneys General.*

---

*\*Solicitor General Bork, Assistant Attorney General Taft, Harry R. Sachse, Edmund B. Clark,* and *Jacques B. Gelin* filed a brief for the United States as *amicus curiae* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case presents the question reserved in, *McClana-han* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 178 n. 18 (1973): whether the grant of civil jurisdiction to the States conferred by § 4 of Pub. L. 280, 67 Stat. 589, 28 U. S. C. § 1360, is a congressional grant of power to the States to tax reservation Indians except insofar as taxation is expressly excluded by the terms of the statute.

Petitioner Russell Bryan, an enrolled member of the Minnesota Chippewa Tribe,[1] resides in a mobile home on land held in trust by the United States for the Chippewa Tribe on the Leech Lake Reservation in Minnesota. In June 1972, petitioner received notices from the auditor of respondent Itasca County, Minn., that he had been assessed personal property tax liability on the mobile home totaling $147.95. Thereafter, in September 1972, petitioner brought this suit in the Minnesota District Court seeking a declaratory judgment that the State and county were without authority to levy such a tax on personal property of a reservation Indian on the reservation and that imposition of such a tax was contrary to federal law. The Minnesota District Court rejected the contention and entered judgment for respondent county. The Minnesota Supreme Court affirmed, 303 Minn. 395, 228 N. W. 2d 249 (1975). We granted certiorari, 423 U. S. 923 (1975), and now reverse.

I

Principles defining the power of States to tax reserva-

---

[1] The Minnesota Chippewa Tribe is a federally recognized tribe with a constitution approved by the Secretary of the Interior. Memorandum for United States as *Amicus Curiae* 2 n. 2. Its reservation was established by the Treaty of Feb. 22, 1855, 10 Stat. 1165.

tion Indians and their property and activities on federally established reservations were clarified in *McClanahan* v. *Arizona State Tax Comm'n, supra.* As summarized in its companion case, *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973), *McClanahan* concluded:

> "[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan* . . . lays to rest any doubt in this respect by holding that such taxation is not permissible absent Congressional consent." *Mescalero Apache Tribe* v. *Jones, supra,* at 148.[2]

---

[2] The *McClanahan* principle derives from a general pre-emption analysis, 411 U. S., at 172, that gives effect to the plenary and exclusive power of the Federal Government to deal with Indian tribes, *United States* v. *Mazurie,* 419 U. S. 544, 554 n. 11 (1975); *Morton* v. *Mancari,* 417 U. S. 535, 551–552 (1974); *Board of Comm'rs* v. *Seber,* 318 U. S. 705, 715–716 (1943), and "to regulate and protect the Indians and their property against interference even by a state," *id.,* at 715. This pre-emption analysis draws support from "the 'backdrop' of the Indian sovereignty doctrine," *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 475 (1976); " '[t]he policy of leaving Indians free from state jurisdiction and control [which] is deeply rooted in the Nation's history,' " *McClanahan,* 411 U. S., at 168; and the extensive federal legislative and administrative regulation of Indian tribes and reservations, *id.,* at 173–179. "Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation," *Williams* v. *Lee,* 358 U. S. 217, 220 (1959), and therefore " 'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.' " *McClanahan, supra,* at 170–171 (quoting United States Department of the Interior, Federal Indian Law 845 (1958)).

Of course, this pre-emption model usually yields different conclusions as to the application of state laws to tribal Indians who

*McClanahan* held that Arizona was disabled in the absence of congressional consent from imposing a state income tax on the income of a reservation Indian earned solely on the reservation. On the authority of *McClanahan*, *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), held this Term that in the absence of congressional consent the State was disabled from imposing a personal property tax on motor vehicles owned by tribal members living on the reservation, or a vendor license fee applied to a reservation Indian conducting a business for the tribe on reservation land, or a sales tax as applied to on-reservation sales by Indians to Indians.

Thus *McClanahan* and *Moe* preclude any authority in respondent county to levy a personal property tax upon petitioner's mobile home in the absence of congressional consent. Our task therefore is to determine whether § 4 of Pub. L. 280, 28 U. S. C. § 1360, constitutes such consent.

Section 4 (a), 28 U. S. C. § 1360 (a), provides:

> "Each of the States . . . listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over other civil causes of action, and those civil laws of such State . . . that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . . :
>
> .    .    .    .    .

have left or never inhabited federally established reservations, or Indians "who do not possess the usual accoutrements of tribal self-government," *McClanahan, supra,* at 167–168; see *Mescalero Apache Tribe,* 411 U. S., at 148–149.

"Minnesota . . . All Indian country within the State, except the Red Lake Reservation."

The statute does not in terms provide that the tax laws of a State are among "civil laws . . . of general application to private persons or private property." The Minnesota Supreme Court concluded, however, that they were, finding in § 4 (b) of the statute a negative implication of inclusion in § 4 (a) of a general power of tax. Section 4 (b), 28 U. S. C. § 1360 (b), provides:

"Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

The Minnesota Supreme Court reasoned that "unless paragraph (a) is interpreted as a general grant of the power to tax, then the exceptions contained in paragraph (b) are limitations on a nonexistent power." 303 Minn., at 402, 228 N. W. 2d, at 253.[3] Therefore, the state court held: "Public Law 280 is a clear grant of the power

---

[3] The State Supreme Court relied upon *Omaha Tribe of Indians* v. *Peters*, 382 F. Supp. 421 (1974), aff'd, 516 F. 2d 133 (CA8 1975), where the District Court for the District of Nebraska gave the same construction to Pub. L. 280 in upholding a state income tax levied against reservation Indian income.

to tax." *Id.*, at 406, 228 N. W. 2d, at 256.[4] We disagree. That conclusion is foreclosed by the legislative history of Pub. L. 280 and the application of canons of construction applicable to congressional statutes claimed to terminate Indian immunities.

## II

The primary concern of Congress in enacting Pub. L. 280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement. See Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U. C. L. A. L. Rev. 535, 541–542 (1975). The House Report states:

> "These States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions. The applicability of Federal criminal laws in States having Indian reservations is also limited. The United States district courts have a measure of jurisdiction over offenses committed on Indian reservations or other Indian country by or against Indians, but in cases of offenses committed by Indians against Indians that jurisdiction is limited to the so-called 10 major crimes: murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny.
>
> "As a practical matter, the enforcement of law

---

[4] Petitioner had not properly raised a claim that his mobile home was in fact annexed to tribal trust land and therefore a part of the real property expressly excluded from taxation by § 4 (b). The Minnesota Supreme Court found, therefore, that the mobile home was personal property taxable as such under Minnesota law.

and order among the Indians in the Indian country has been left largely to the Indian groups themselves. In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility." H. R. Rep. No. 848, 83d Cong., 1st Sess., 5–6 (1953).[5]

Thus, provision for state criminal jurisdiction over offenses committed by or against Indians on the reservations was the central focus of Pub. L. 280 and is embodied in § 2 of the Act, 18 U. S. C. § 1162.[6]

---

[5] This House Report and the Senate Report, S. Rep. No. 699, 83d Cong., 1st Sess. (1953), are in all material respects identical. All citations herein are to the House Report.

[6] Section 2 of Pub. L. 280, 18 U. S. C. § 1162, provides:

"State jurisdiction over offenses committed by or against Indians in the Indian country.

"(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| "State or Territory of | Indian country affected |
| --- | --- |
| . . . . . | |
| "Minnesota . . . . . | All Indian country within the State, except the Red Lake Reservation. |
| . . . . . | |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or com-

In marked contrast in the legislative history is the virtual absence of expression of congressional policy or intent respecting § 4's grant of civil jurisdiction to the States. Of special significance for our purposes, however, is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations. Neither the Committee Reports nor the floor discussion in either House mentions such authority.[7] This omission has significance in the application of the canons of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress.[8] The only mention of taxation authority is in a colloquy between Mr. Sellery, Chief Counsel of the Bureau of Indian Affairs, and Congressman Young during House committee hearings on Pub. L. 280. That colloquy strongly suggests that Congress did not mean to grant tax authority to the States:

"Mr. Young. Does your bill limit the provision

---

munity that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

"(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction."

[7] 99 Cong. Rec. 9962, 10782–10784, 10928 (1953).

[8] See Israel & Smithson, Indian Taxation, Tribal Sovereignty and Economic Development, 49 N. D. L. Rev. 267, 292 (1973).

for Federal assistance to States in defraying the increased expenses of the courts in connection with the widening of the jurisdiction that the bill encompasses?

"Mr. Sellery. No; it does not.

"Mr. Young. Do you think it would be necessary to provide for some payment, inasmuch as the great portion of Indian lands are not subject to taxation?

"Mr. Sellery. . . . Generally, the Department's views are that if we started on the processes of Federal financial assistance or subsidization of law enforcement activities among the Indians, it might turn out to be a rather costly program, and it is a problem which the States should deal with and accept without Federal financial assistance; otherwise there will be some tendency, the Department believes, for the Indian to be thought of and perhaps to think of himself because of the financial assistance which comes from the Federal Government as still somewhat a member of a race or group which is set apart from other citizens of the State. And it is desired to give him and the other citizens of the State the feeling of a conviction that he is in the same status and has access to the same services, including the courts, as other citizens of the State who are not Indians.

"Mr. Young. That would not quite be true, though; would it? Because for the most part he does not pay any taxes.

"Mr. Sellery. No. There is that difference.

"Mr. Young. A rather sizable difference in not paying for the courts or paying for the increased expenses for judicial proceedings.

"Mr. Sellery. The Indians, of course, do pay other forms of taxes. I do not know how the courts

of Nevada are supported financially, but the Indians do pay the sales tax and other taxes.

"Mr. Young. But no income tax or corporation tax or profits tax. You understand a large portion of the land is held in trust and therefore is not subject to tax.

"Mr. Sellery. That is correct.

"Mr. Young. So far as my State is concerned, it would be a large burden on existing costs of judicial procedure. I think it is only right that the Federal Government should make some contribution for that. You seem to differentiate. I think there is a differentiation, too, in that they are not paying taxes.

"Mr. Sellery. I will concede your point that they are not paying taxes. The Department has recommended, nevertheless, that no financial assistance be afforded to the States." App. 55–56.[9]

Piecing together as best we can the sparse legislative history of § 4, subsection (a) seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes; this is definitely the import of the statutory wording conferring upon a State "jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in . . . Indian country . . . to the same extent that such State . . . has jurisdiction over other civil causes of action." With this as the primary

---

[9] Unpublished Transcript of Hearings on H. R. 1063 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. (1953). The transcript was produced by the United States during the briefing of *Tonasket* v. *Washington*, 411 U. S. 451 (1973). The portion quoted in the text is reproduced in the Appendix in the instant case.

focus of § 4 (a), the wording that follows in § 4 (a)—
"and those civil laws of such State . . . that are of general
application to private persons or private property shall
have the same force and effect within such Indian coun-
try as they have elsewhere within the State"—authorizes
application by the state courts of their rules of decision
to decide such disputes.[10] Cf. 28 U. S. C. § 1652. This
construction finds support in the consistent and uncon-
tradicted references in the legislative history to "per-
mitting" *"State courts to adjudicate* civil controversies"
arising on Indian reservations, H. R. Rep. No. 848, pp.
5, 6 (emphasis added), and the absence of anything
remotely resembling an intention to confer general state
civil regulatory control over Indian reservations.[11] In

---

[10] Cf. Israel & Smithson, *supra,* n. 8, at 296:

"A fair reading of these two clauses suggests that Congress never
intended 'civil laws' to mean the entire array of state noncriminal
laws, but rather that Congress intended 'civil laws' to mean those
laws which have to do with private rights and status. Therefore,
'civil laws . . . of general application to private persons or private
property' would include the laws of contract, tort, marriage, divorce,
insanity, descent, etc., but would not include laws declaring or im-
plementing the states' sovereign powers, such as the power to tax,
grant franchises, etc. These are not within the fair meaning of
'private' laws."

[11] Moreover, this interpretation is consistent with the title of
Pub. L. 280, H. R. Rep. No. 848, p. 3: "A bill to confer jurisdiction
on the States . . . , with respect to criminal offenses and civil causes
of action committed or arising on Indian reservations within such
States, and for other purposes" (the other purposes being § 8's with-
drawal from the affected areas of the operation of the Federal Indian
Liquor Laws, and §§ 6–7's provision of a method whereby additional
States could assume civil and criminal jurisdiction over Indian reser-
vations). Additionally, this interpretation is buttressed by § 4 (c),
which provides that "any tribal ordinance or custom . . . adopted by
an Indian tribe . . . in the exercise of any authority which it may
possess shall, if not inconsistent with any applicable civil law of the
State, be given full force and effect *in the determination of civil
causes of action* pursuant to this section" (emphasis added). Fi-

short, the consistent and exclusive use of the terms "civil causes of action," "aris[ing] on," "civil laws . . . of general application to private persons or private property," and "adjudicat[ion]," in both the Act and its legislative history virtually compels our conclusion that the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court.

Furthermore, certain tribal reservations were completely exempted from the provisions of Pub. L. 280 precisely because each had a "tribal law-and-order organization that functions in a reasonably satisfactory manner." H. R. Rep. No. 848, p. 7.[12] Congress plainly

nally, reading § 4 (a) as an integrated whole, with the reference to state civil law as intended to provide the rules of decision for the private civil causes of action over which state courts were granted jurisdiction is consistent with § 3 of Pub. L. 280, which codifies § 4 in Title 28 of the United States Code. That Title collects Acts of Congress governing jurisdiction and the judiciary. Section 4 would be expected to be codified in Title 25, governing Indian affairs if general state regulatory power over Indian reservations were being granted. Indeed, § 4 is entitled, as provided in Pub. L. 280 and codified at 28 U. S. C. § 1360, "State civil jurisdiction in actions to which Indians are parties."

[12] Tribal groups in the affected States which were exempted from the coverage of Pub. L. 280 because they had "reasonably satisfactory law-and-order" organizations, had objected to the extension of state criminal and civil jurisdiction on various grounds. Three of the tribes exempted objected due to their fear of inequitable treatment of reservation Indians in the state courts. H. R. Rep. No. 848, pp. 7–8. Two of the objecting tribes expressed the fear that "the extension of State law to their reservations would result in the loss of various rights." *Id.*, at 8. One tribe objected on the ground that its members were "not yet ready to be subjected to State laws." *Ibid.* Certainly if abolition of traditional Indian immunity from state taxation, except insofar as expressly excluded, was an anticipated result of Pub. L. 280's extension of civil jurisdiction, vehement Indian objections on this specific ground would also have been voiced.

meant only to allow state courts to decide criminal and civil matters arising on reservations not so organized. Accordingly, rather than the expansive reading given § 4 (a) by the Minnesota Supreme Court, we feel that the construction we give the section is much more consonant with the revealed congressional intent. Moreover, our construction is consistent with our prior references to § 4 as "the extension of state jurisdiction over civil causes of action by or against Indians arising in Indian country." *Kennerly* v. *District Court of Montana,* 400 U. S. 423, 427 (1971). See also *id.,* at 424 n. 1; *id.,* at 430–431 (STEWART, J., dissenting); *Warren Trading Post* v. *Arizona Tax Comm'n,* 380 U. S. 685, 687 n. 3 (1965); *Menominee Tribe* v. *United States,* 391 U. S. 404, 416 n. 8 (1968) (STEWART, J., dissenting).

Our construction is also more consistent with Title IV of the Civil Rights Act of 1968, 82 Stat. 78, 25 U. S. C. §§ 1321–1326. Title IV repeals § 7 of Pub. L. 280 and requires tribal consent as a condition to further state assumptions of the jurisdiction provided in 18 U. S. C. § 1162 and 28 U. S. C. § 1360. Section 402 of Title IV, 25 U. S. C. § 1322, tracks the language of § 4 of Pub. L. 280. Section 406 of Title IV, 25 U. S. C. § 1326, which provides for Indian consent, refers to "State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action . . . ." It is true, of course, that the primary interpretation of § 4 must have reference to the legislative history of the Congress that enacted it rather than to the history of Acts of a later Congress. Nevertheless, Title IV of the 1968 Act is intimately related to § 4, as it provides the method for further state assumptions of the jurisdiction conferred by § 4, and we previously have construed the effect of legislation affecting reservation Indians in light of "intervening" legislative enactments. *Moe* v. *Salish & Kootenai Tribes,* 425 U. S., at 472–475. It would be

difficult to suppose that Congress in 1968 intended the meaning of § 4 to vary depending upon the time and method by which particular States acquired jurisdiction. And certainly the legislative history of Title IV makes it difficult to construe § 4 jurisdiction acquired pursuant to Title IV as extending general state civil regulatory authority, including taxing power, to govern Indian reservations. Senator Ervin, who offered and principally sponsored Title IV, see *Kennerly* v. *District Court of Montana, supra,* at 429 n. 5, referred to § 1360 civil jurisdiction as follows:

> "Certain representatives of municipalities have charged that the repeal of [§ 7 of] Public Law 280 would hamper air and water pollution controls and provide a haven for undesirable, unrestricted business establishments within tribal land borders. Not only does this assertion show the lack of faith that certain cities have in the ability and desire of Indian tribes to better themselves and their environment, but, *most importantly, it is irrelevant, since Public Law 280 relates primarily to the application of state civil and criminal law in court proceedings,* and has no bearing on programs set up by the States to assist economic and environmental development in Indian territory." (Emphasis added.) Hearing before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, No. 90–23, 90th Cong., 2d Sess., 136 (1968).

### III

Other considerations also support our construction. Today's congressional policy toward reservation Indians may less clearly than in 1953 favor their assimilation, but Pub. L. 280 was plainly not meant to effect total assimilation. Public L. 280 was only one of many types of assimilationist legislation under active consideration

in 1953. H. R. Rep. No. 848, pp. 3–5; *Santa Rosa Band of Indians* v. *Kings County,* 532 F. 2d 655, 662 (CA9 1975).[13] And nothing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than " 'private, voluntary organizations,' " *United States* v. *Mazurie,* 419 U. S. 544, 557 (1975)—a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers, including taxation, of state and local governments.[14] The Act itself refutes such an

---

[13] The legislative history of Pub. L. 280 does contain a congressional expression that "the Indians of several States have reached a stage of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country." H. R. Rep. No. 848, p. 6. But not too much can be made of this unelaborated statement; its thrust is too difficult to reconcile with the focus of Pub. L. 280—extending state jurisdiction to those reservations with the least developed and most inadequate tribal legal institutions; presumably those tribes evincing the least "acculturation and development" in terms of the mainstream of American society. See Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U. C. L. A. L. Rev. 535, 543 (1975).

[14] Much has been written on the subject of a devastating impact on tribal governments that might result from an interpretation of § 4 as conferring upon state and local governments general civil regulatory control over reservation Indians. *Santa Rosa Band of Indians* v. *Kings County,* 532 F. 2d 655, 662–663, 666–668 (CA9 1975); Goldberg, *supra;* Note, The Extension of County Jurisdiction Over Indian Reservations in California: Public Law 280 and the Ninth Circuit, 25 Hastings L. J. 1451 (1974); Comment, Indian Taxation: Underlying Policies and Present Problems, 59 Calif. L. Rev. 1261 (1971). The suggestion is that since tribal governments are disabled under many state laws from incorporating as local units of government, Goldberg, *supra,* at 581, general regulatory control might relegate tribal governments to a level below

inference: there is notably absent any conferral of state jurisdiction over the tribes themselves, and § 4 (c), 28 U. S. C. § 1360 (c), providing for the "full force and effect" of any tribal ordinances or customs "heretofore or hereafter adopted by an Indian tribe . . . if not inconsistent with any applicable civil law of the State," contemplates the continuing vitality of tribal government.

Moreover, the same Congress that enacted Pub. L. 280 also enacted several termination Acts [15]—legislation which is cogent proof that Congress knew well how to express its intent directly when that intent was to subject reservation Indians to the full sweep of state laws and state taxation. Cf. *Board of Comm'rs* v. *Seber,* 318 U. S. 705, 713 (1943); *Goudy* v. *Meath,* 203 U. S. 146, 149 (1906). These termination enactments provide expressly for subjecting distributed property "and any income derived therefrom by the individual, corporation, or other legal entity . . . to the same taxes, State and Federal, as in the case of non-Indians," 25 U. S. C.

---

that of counties and municipalities, thus essentially destroying them, particularly if they might raise revenue only after the tax base had been filtered through many governmental layers of taxation. Present federal policy appears to be returning to a focus upon strengthening tribal self-government, see, *e. g.,* Indian Financing Act of 1974, 88 Stat. 77, 25 U. S. C. § 1451 *et seq.* (1970 ed., Supp. V); Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203, 25 U. S. C. § 450 *et seq.* (1970 ed., Supp. V), and the Court of Appeals for the Ninth Circuit has expressed the view that courts "are not obliged in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship." *Santa Rosa Band of Indians* v. *Kings County, supra,* at 663.

[15] 68 Stat. 718, 25 U. S. C. § 564 (Klamath Tribe); 68 Stat. 768, 25 U. S. C. §§ 721–728 (Alabama and Coushatta Tribes of Texas); 68 Stat. 1099, 25 U. S. C. §§ 741–760 (Paiute Indians of Utah); 68 Stat. 250, 25 U. S. C. §§ 891–901 (Menominee Tribe of Wisconsin).

§§ 564j, 749, 898, and provide that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 25 U. S. C. §§ 564q, 757, 899; cf. 25 U. S. C. § 726. These contemporaneous termination Acts are *in pari materia* with Pub. L. 280. *Menominee Tribe* v. *United States*, 391 U. S., at 411. Reading this express language respecting state taxation and application of the full range of state laws to tribal members of these contemporaneous termination Acts, the negative inference is that Congress did not mean in § 4 (a) to subject reservation Indians to state taxation. Thus, rather than inferring a negative implication of a grant of general taxing power in § 4 (a) from the exclusion of certain taxation in § 4 (b), we conclude that construing Pub. L. 280 *in pari materia* with these Acts shows that if Congress in enacting Pub. L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so.

### IV

Additionally, we note that § 4 (b), excluding "taxation of any real or personal property . . . belonging to any Indian or any Indian tribe . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States," is not obviously the narrow exclusion of state taxation that the Minnesota Supreme Court read it to be. On its face the statute is not clear whether the exclusion is applicable only to taxes levied directly on the trust property specifically, or whether it also excludes taxation on activi-

ties taking place in conjunction with such property and income deriving from its use. And even if read narrowly to apply only to taxation levied against trust property directly, § 4 (b) certainly does not expressly authorize all other state taxation of reservation Indians.

Moreover, the express prohibition of any "alienation, encumbrance, or taxation" of any trust property can be read as prohibiting state courts, acquiring jurisdiction over civil controversies involving reservation Indians pursuant to § 4, from applying state laws or enforcing judgments in ways that would effectively result in the "alienation, encumbrance, or taxation" of trust property. Indeed, any other reading of this provision of § 4 (b) is difficult to square with the identical prohibition contained in § 2 (b) of the Act, which applies the same restrictions upon States exercising criminal jurisdiction over reservation Indians. It would simply make no sense to infer from the identical language of § 2 (b) a general power in § 2 (a) to tax Indians in all other respects since § 2 (a) deals only with criminal jurisdiction.

Indeed, § 4 (b) in its entirety may be read as simply a reaffirmation of the existing reservation Indian-Federal Government relationship in all respects save the conferral of state-court jurisdiction to adjudicate private civil causes of action involving Indians. We agree with the Court of Appeals for the Ninth Circuit that § 4 (b) "is entirely consistent with, and in effect is a reaffirmation of, the law as it stood prior to its enactment." *Kirkwood* v. *Arenas*, 243 F. 2d 863, 865–866 (1957). The absence of more precise language respecting state taxation of reservation Indians is entirely consistent with a general uncertainty in 1953 of the precise limits of state power to tax reservation Indians respecting other than their trust property, and a con-

gressional intent merely to reaffirm the existing law whatever subsequent litigation might determine it to be.[16]

Finally, in construing this "admittedly ambiguous" statute, *Board of Comm'rs* v. *Seber,* 318 U. S., at 713, we must be guided by that "eminently sound and vital canon," *Northern Cheyenne Tribe* v. *Hollowbreast,* 425 U. S. 649, 655 n. 7 (1976), that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89 (1918). See *Choate* v. *Trapp,* 224 U. S. 665, 675 (1912); *Antoine* v. *Washington,* 420 U. S. 194, 199–200 (1975). This principle of statutory construction has particular force in the face of claims that ambiguous statutes abolish by implication Indian tax immunities. *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 174; *Squire* v. *Capoeman,* 351 U. S. 1, 6–7 (1956); *Carpenter* v. *Shaw,* 280 U. S. 363, 366–367 (1930). "This is so because . . . Indians stand in a special relation to the federal government from which the states are excluded unless the Congress has manifested a clear purpose to terminate [a tax] immunity and allow states to treat Indians as part of the general community." *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598, 613–614 (1943) (Murphy, J., dissenting). What we recently said of a claim that

---

[16] Congress would have been fully justified in 1953 in being uncertain as to state power to levy a personal property tax on reservation Indians. No decision of this Court directly resolved the issue until *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), decided earlier this Term. It appears that the only decision of this Court prior to 1953 dealing with state power to levy a personal property tax on reservation Indians was *United States* v. *Rickert,* 188 U. S. 432, 443–444 (1903), which held exempt from state taxation personal Indian property purchased with federal funds. See United States Department of the Interior, Federal Indian Law 865 (1958).

Congress had terminated an Indian reservation by means of an ambiguous statute is equally applicable here to the respondent's claim that § 4 (a) of Pub. L. 280 is a clear grant of power to tax, and hence a termination of traditional Indian immunity from state taxation:

> "Congress was fully aware of the means by which termination could be effected. But clear-termination language was not employed in the . . . Act. This being so, we are not inclined to infer an intent to terminate . . . . A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz* v. *Arnett,* 412 U. S. 481, 504–505 (1973).

The judgment of the Minnesota Supreme Court is

*Reversed.*