**UNITED STATES of America, Plaintiff,**

v.

**Robert Louis HOODIE and Aaron Daniel Kennedy, Defendants.**

**No. CR 77–142.**

United States District Court,
D. Oregon.

Dec. 9, 1977.

William W. Youngman, Asst. U.S. Atty., Portland, Or., for plaintiff.

Susan F. Mandiberg, Portland, Or., for defendants.

## OPINION and ORDER

BURNS, District Judge:

The question presented is whether the United States has jurisdiction over major crimes committed on an Indian reservation created in 1972, in a state to which the federal government in 1953 passed jurisdiction over offenses by or against Indians in Indian country. Put differently, the question is whether "Indian country within the State," as that phrase applies to Oregon in 18 U.S.C. § 1162, means Indian country in existence when § 1162 was enacted, or includes after-created Indian country as well.

The defendants, Robert Hoodie and Aaron Kennedy, are enrolled members of the Burns Paiute Indian Tribe. A federal grand jury indictment charges them with having committed burglary of the Community Center and Tribal Office building located on the Burns Paiute Indian Reservation, near Burns, Oregon, on or about June 24, 1977. The setting is "Indian country." 18 U.S.C. § 1151. The crime therefore appears to be a federal offense under the Federal Major Crimes Act, 18 U.S.C. § 1153, which provides that

[a]ny Indian who commits against the person or property of another Indian or other person . . . burglary . . within the Indian country, shall be subject to the same laws and penalties as all other persons committing [burglary], within the exclusive jurisdiction of the United States.

Under 18 U.S.C. § 3242, a federal district court has jurisdiction to try violations of the Federal Major Crimes Act.

Defendants, however, argue that 18 U.S.C. § 1162 deprives this court of its power to try them on this indictment. They rely specifically on subsection (a) of § 1162, which assigns to the State of Oregon "jurisdiction over offenses by or against Indians in . . . all Indian country within the State, except the Warm Springs Reservation," and on subsection (c), which states that

[t]he provisions of [the Major Crimes Act] shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction.

Thus the defensive contention is a dual one: that no federal offense has been committed, and that if one has it can not be tried in an Oregon federal court.

Section 1162 would compel me to dismiss the indictment for want of jurisdiction, were it not for the fact that this nation's Indian policy changed dramatically in the 19 years between the enactment of § 1162 and the establishment of the Burns Paiute Indian Reservation. The evidence of that shift appears in the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1321–26, and in the act creating the Burns Paiute Reservation. Pub.L. No. 92–488, 86 Stat. 806 (Oct. 13, 1972). The later legislation suggests that Congress may have limited the scope of

§ 1162, *sub silentio,* to the Indian country that existed in Oregon in 1953.

The case is one of first impression. This is apparently the first federal indictment of any defendant on the Burns Paiute Reservation since it was established in 1972. Moreover, this is the only reservation created in a § 1162(a) "mandatory" state[1] since it acquired jurisdiction over Indian country in 1953. One or another of the aforementioned features is missing from the cases on which defendants rely. Those cases involve either the jurisdiction of a "mandatory" state over pre-existing Indian country, e. g., *Anderson v. Gladden,* 293 F.2d 463 (9th Cir.), *cert. denied,* 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961) (Klamath Indian Reservation, Oregon), or the jurisdiction of an "option" state[2] over acquired Indian country, e. g., *Confederated B. & T. of Yakima Indian Nation v. State of Washington,* 550 F.2d 443 (9th Cir. 1977) (Washington); *Kills Crow v. United States,* 451 F.2d 323 (8th Cir.), *cert. denied,* 405 U.S. 999, 92 S.Ct. 1262, 31 L.Ed.2d 467 (1971) (South Dakota). In determining whether this court has power to hear this case, I find those decisions helpful but not controlling. Certainly they do not prevent my further reference to the history of federal Indian policy and the canons of construction of federal Indian legislation.

Our country has never satisfactorily exorcised from its conscience its past treatment of the Indian, or, for that matter, its current treatment. The misgivings of conquest persist. They are manifest in the ambivalence and inconsistency of our wardship. Historically, Congress and the Department of the Interior have swung between two models of Indian administration having widely divergent implications.

1. The 1953 legislation, as will be more fully described below, divided the states in which Indian country was located into two classes. Five states—California, Minnesota, Nebraska, Oregon, and Wisconsin—were given civil and criminal jurisdiction outright over all Indian country within their exterior boundaries with the exception of a few named reservations. These became known as the "mandatory" states. Alaska was added to their number in 1958. Pub.L. No. 85–615, 72 Stat. 545 (Aug. 8, 1958). The remaining states were given the choice of assuming civil or criminal jurisdiction, or both, over the Indian country within their exterior boundaries. These became known as the "option" states.

2. See footnote 1, *supra.*

One model focuses on the inclusion of Indian reservations within state boundaries, the rights of Indians as state citizens, and the desirability of Indian assimilation into the mainstream of American culture; its policy implications have included removing Indian lands from trust status and subjecting Indians to state law. [The other] model focuses on the unique status of Indian tribes as sovereignties antedating the European settlement of America, the special federal responsibility for Indian welfare, and the decentralized nature of jurisdiction in the United States generally; it has tended to produce policies fostering tribal autonomy and economic development of reservations through federal training, subsidies, loans, technical assistance, and insulation from the burdens of state law.

Goldberg, "Public Law 280: The Limits of State Jurisdiction Over Reservation Indians," 22 U.C.L.A.L.Rev. 535, 536 (1975).

It is a fair summary of federal policy until 1940 to say that it emulated the second model of Indian-state relations. The prevailing wisdom was to keep states out of Indian affairs by precluding state jurisdiction over Indian lands. The constitutions of many Western states contain express disclaimers of jurisdiction over Indian lands, which were required by Congress as a condition of admission to the Union. Clinton, "Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze," 18 Ariz.L.Rev. 503, 564 (1976). A federal protectorate was maintained, originally to safeguard the interests of adjacent settlers, Clinton, "Development of Criminal Jurisdiction Over Indian Lands: The Historical Perspective," 17 Ariz.L.Rev. 951, 953 (1975), but later for other reasons. As Indian lands began to be incorporated within the exterior boundaries of newly created states,

federal jurisdiction became the means of protecting Indians against their neighbors,[3] and of encouraging tribal self-development. Clinton, "Jurisdictional Maze," *supra* at 521–22 n. 88.

After 1940, the policy of the federal government on Indian affairs swung away from its earlier bearings. Congress enacted a number of measures, chiefly in the early 1950's, that assumed it was practicable as well as desirable to terminate federal responsibility and to assimilate Indians into the American mainstream. The high water mark of the assimilationist era was the act commonly known as Public Law 280. Act of Aug. 15, 1953, ch. 505, 67 Stat. 588–90 (now codified as amended in scattered sections of 18, 25 U.S.C.).[4] Section 2 of PL–280, the source of 18 U.S.C. § 1162, transferred to five willing states, including Oregon, civil and criminal jurisdiction over all Indian country within their borders, except for certain reservations. Section 7 of PL–280 gave the consent of the United States to the assumption of comparable jurisdiction by any other state having Indian territory. The statute, as thus drafted, was to reflect the interests of all parties to any transfer of Indian jurisdiction, save the Indians.

Public Law 280 was, in the words of one Indian representative, "probably the most objectionable general legislation affecting Indians passed in the 20th century." *Hearings on H.R. 15419 and Related Bills Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs,* 90th Cong., 2d Sess. 115 (1968) (hereinafter cited as 1968 Hearings). The statutory provisions authorizing state jurisdiction without Indian consent came under attack from the very outset. Even as he signed the legislation, President Eisenhower expressed his "grave doubts" about non-

---

**3.** The Ninth Circuit noted last year that "antagonism between reservation Indians and the surrounding populations does persist. History, broken promises, cultural differences and neglect all contribute to it. Reluctance on the part of the States to accord to the Indians rights guaranteed to them by treaties still exists." *Oliphant v. Schlie,* 544 F.2d 1007, 1013 (9th Cir. 1976), *cert. granted sub nom. Oliphant*

*v. Squamish Indian Tribe,* 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977).

**4.** Other statutes passed in 1954 terminated the trust status of individual reservations. *See, e. g.,* 25 U.S.C. § 677 (Ute); 25 U.S.C. §§ 691–708 (Western Oregon tribes); 25 U.S.C. §§ 891–902 (Menominee).

consensual transfer and recommended a curative amendment. Brophy and Aberle, *The Indian: America's Unfinished Business* 186 (1966). Later, in March, 1968, President Johnson called formally for replacement of the goal of "termination" by the goal of "self-determination." 114 Cong. Rec. 5394–95, 5397 (1968) (Message to Congress on the American Indian).

These Presidents were understating Indian sentiments. At congressional hearings held in 1968, the Bureau of Indian Affairs reported that its files were "filled with resolutions and communications from Indian groups urging alteration of the statute." *1968 Hearings, supra* at 25. An Indian spokesman testified that "[o]f all Indian legislation on the books there is none better known to Indians, or more generally despised, than Public Law 280." *Id.* at 109. After reading the record of those hearings, it is difficult not to agree with that judgment.

Congress responded to the overwhelming criticism of the 1953 legislation by enacting Title 4 of Public Law 90–284, better known as the Indian Civil Rights Act of 1968. This legislation did not disturb the status quo in areas of Indian country over which the states had already assumed jurisdiction according to the mandatory or optional procedures of PL–280. 25 U.S.C. § 1323(b); 1968 U.S.Code Cong. & Admin.News, p. 1866 (additional views of Sen. Ervin). But it did remove the apparatus by which that jurisdiction had been transferred, and it erased all other watermarks of Congress' earlier blessing of state jurisdiction without regard to Indian wishes. The Act repealed Section 7 of PL–280 and substituted 25 U.S.C. §§ 1321 and 1322. Section 1321(a) provides that assertions of state jurisdiction over criminal offenses must be based on the *joint* consent of the state and Indian tribes affected. Section 1322(a) codifies a similar rule for transfers of civil jurisdiction. Finally the Indian Civil Rights Act authorized the retrocession of "all or any measure of criminal or civil jurisdiction, or both," that had been acquired by "mandatory" and "option" states as a result of PL–280. 25 U.S.C. § 1323(a). A clearer repudiation of

the earlier termination policy can scarcely be imagined, unless Congress had taken back jurisdiction over Indian country that had passed by them to the states. The price of that course in federal relations would, presumably, have been high indeed.

The Indian Civil Rights Act embodies policies that bear on the jurisdictional status of the more recent Burns Paiute Reservation. There is no evidence that Congress abandoned, in a short four-year span, its commitment to Indian autonomy. The signs rather suggest the contrary: creating a reservation is not the act of a legislature bent on assimilation. Congress' concern with the unconsented subjection of Indians to state laws and courts is equally at war with the repealed provisions of Section 7 of PL–280 and a broad reading of 18 U.S.C. § 1162.

"The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945), *quoted in McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 168, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). *See also, Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 2105 n. 2, 48 L.Ed.2d 710 (1976); *Worcester v. Georgia,* 6 pet. 515, 557, 8 L.Ed. 483 (1832). A narrow reading of 18 U.S.C. § 1162 in favor of federal jurisdiction would be consistent with that policy.

Moreover, we must bear in mind that "eminently sound and vital canon," *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 96 S.Ct. 1793, 1797 n. 7, 48 L.Ed.2d 274 (1976), that "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indian." *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918), quoted in *Bryan, supra,* 96 S.Ct. at 2113; *accord, McClanahan, supra,* 411 U.S. at 174–75, 93 S.Ct. 1257; *Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *United States v. Nice,* 241 U.S. 591, 599, 36 S.Ct. 696, 60

L.Ed. 1192 (1916). The record interest of the Burns Paiute Indians, in whose favor I may interpret, 18 U.S.C. § 1162, is not as clear as one would wish. But insofar as it can be ascertained, it speaks against finding that the State of Oregon has exclusive jurisdiction over major crimes on the Reservation. I take it, in this day of diminishing paternalism, that the stated preferences of Native Americans are at least probative of what a court should consider their "interest" to be.

■ The overwhelming nationwide opposition of Indian tribes to state jurisdiction under PL–280 has been noted. Since the 1968 amendments no tribe has formally consented to the extension of state criminal jurisdiction over its lands. Clinton, "Jurisdictional Maze," *supra* at 549. Five states —Nebraska, Nevada, Minnesota, Washington, and Wisconsin—have in fact retroceded criminal jurisdiction they once assumed under PL–280. *Id.*[5]

In Oregon, the Warm Springs Tribe has been exempt from state jurisdiction since 1953, when the Tribe expressed fear of inequitable treatment in the state courts as well as the lack of any benefit to members in transferring responsibility to a local government financially incapable of assistance. 18 U.S.C. § 1162; *Anderson, supra,* 293 F.2d at 466 n. 7; Note, "The Extension of County Jurisdiction Over Indian Reservations in California: Public Law 280 and the Ninth Circuit," Hastings L.J. 1451, 1470 (1974). This court was advised that the Umatilla Tribe is seeking to return to federal jurisdiction.

Finally, as a result of comments made by counsel and other government officials, it would appear that the elected council of the Burns Paiute Tribe, in whose meetings all members of the tribe may participate, has

voted in favor of federal jurisdictional status for the Reservation. Such action in a case of retrocession has satisfied the requirement of Indian consent to federal jurisdiction. *See Omaha Tribe of Nebraska v. Village of Walthill,* 334 F.Supp. 823, 835 (D.Neb.1971), *aff'd,* 460 F.2d 1327 (8th Cir. 1972), *cert. denied,* 409 U.S. 1107, 93 S.Ct. 898, 34 L.Ed.2d 687 (1973). Also, with the aid of federal funds, the Tribe has evidently established a law enforcement system composed of one full-time and five part-time policemen, a tribal judge, and space for prisoners. The federal assistance, and in all probability the tribal law enforcement system it supports, would be lost if the State of Oregon were held to have jurisdiction over major crimes on the Reservation.[6] It would be bitter irony thus to bring about the very condition that prompted PL–280, namely, the lack of law enforcement on Indian reservations. *Bryan, supra,* 96 S.Ct. at 2107; H.R.Rep. No. 848, 83rd Cong., 1st Sess., 5–6 (1953); U.S.Code Cong. & Admin. News 1953, pp. 2409, 2411–12; Goldberg, *supra* at 541–42.

We are dealing here with a reservation that was not in existence 25 years ago, when Congress conferred criminal jurisdiction over all but one Oregon reservation upon the State of Oregon. The philosophy of those times, which emphasized the termination of federal responsibility and assimilation of the Indian into the mainstream of American culture, has since given way before major criticism. In the Indian Civil Rights Act of 1968, Congress went as far as it could, without disrupting the status quo in states like Oregon, to emphasize the new goals of Indian autonomy and self-determination. The establishment of the Burns Paiute Reservation followed the amendment of Public Law 280 by the 1968 legislation. This establishment was an act so

---

**5.** The states are Washington (Quinalt Reservation—34 Fed.Reg. 14288 (1969)); (Port Madison Reservation—37 Fed.Reg. 7353 (1972)); Nebraska (portion of the Omaha Reservation lying within Thurston County—35 Fed.Reg. 16598 (1970)); Minnesota (Boise Fort Reservation—40 Fed.Reg. 4026 (1975)); Nevada (numerous tribes—40 Fed.Reg. 27501 (1975)); and

Wisconsin (Menominee Reservation—41 Fed. Reg. 8516 (1976)).

**6.** The court was advised that it is the policy of the Bureau of Indian Affairs to consider a state responsible for all measure of criminal jurisdiction once it has assumed a part. The United States will not finance the policing by tribes of misdemeanors merely.

contrary to the assimilationist spirit of Congress in the 1950's, and so consistent with the self-developmental bent of Congress in the 1960's (and of Congress today, *see Bryan, supra,* 96 S.Ct. at 2111; *Oliphant, supra,* 544 F.2d at 1013; Goldberg, *supra* at 539) that I find little difficulty in distinguishing the Burns Paiute Reservation from others in Oregon which existed in 1953. Certainly, as the Warm Springs exception illustrates, there is nothing unusual in assigning jurisdiction over some Indians within a state to the federal government and jurisdiction over others to the state.

Mr. Justice Frankfurter once observed that "[t]he notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious over-simplification." *United States v. Monia,* 317 U.S. 424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943). While Justice Frankfurter's remark was made in dissent, there is no question that it represents a canon of construction of the Supreme Court. "The policy as well as the letter of the law is a guide to decision." *Markham v. Cabell,* 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165 (1945). Where the policy which underlays a statute has long since been discarded by both the legislative and executive branches, as well as attacked by those for whose benefit it was intended, it is well to limit its scope to the areas and peoples that were within the contemplation of Congress at the time it spoke.

For the reasons stated I deny defendants' motion to dismiss. It was agreed, at the hearing on this matter, that if I did deny the motion I could consider a stipulation of facts by the parties and the defendants' waiver of their right to jury trial. I do now consider the stipulation and waiver, and find each of the defendants guilty beyond a reasonable doubt of burglary in violation of 18 U.S.C. § 1153. Presentence reports have been prepared in advance of this ruling and finding. Accordingly, the defendants are ordered to appear for sentencing before this court on December 12, 1977.