Dear Representative Stanley
¶ 0 This office has received your request for an official Attorney General Opinion, in which you ask, in effect, the following question:
 Do the provisions of 3A O.S. 1991, § 209[3A-209], which limit the Oklahoma Horse Racing Commission's authority to issue racetrack licenses to racetrack facilities located in counties in which the voters have approved pari-mutuel horse racing, prohibit the Commission from approving an Oklahoma licensed racetrack's simulcasting its live horse races to an Indian Tribe's off-track wagering facility located in Indian Country in a county whose voters have not approved pari-mutuel horse racing, when the Tribe's off-track wagering facility is operated under a Tribal-State Gaming Compact, entered into between the Tribe and the State under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721?
¶ 1 In regulating gambling on Indian land, the Indian Gaming Regulatory Act ("the Act" or "IGRA"), 25 U.S.C. §§ 2701-2721, divided gambling into three classes. Two of these classes are regulated by the Indian tribes, either alone or with federal supervision. The third is regulated under the term of a Compact negotiated between the Indian Tribe and the State.
¶ 2 Class I gambling consists of "social games solely for prizes of minimal value" and "traditional forms of Indian gaming." 25 U.S.C. § 2703(6). Jurisdiction over Class I gambling lies exclusively with the Indian tribe. 25 U.S.C. § 2710(a)(1).
¶ 3 Class II gambling consists of bingo and, if played at the same location, pull tabs, lotto, punch boards, tip jars, instant bingos and other games similar to bingo.25 U.S.C. § 2703(7)(A)(i)(III). Class II gaming, while left within the jurisdiction of the Indian Tribes, requires, among other things, federal approval of all tribal ordinances or resolutions regulating such gaming. 25 U.S.C. § 2710(a) and (b).
¶ 4 Class III gambling consists of all forms of gambling that are not Class I or Class II gambling, 25 U.S.C. § 2703(8), which includes pari-mutuel horse racing. While Congress concluded that Class I and Class II gambling would be subject to tribal regulations and jurisdiction, Congress looked to the states to help regulate Class III gambling because of the states' experience in regulating such gambling. Under IGRA, this is accomplished through a compacting process through which Tribal-State gambling Compacts are negotiated.
¶ 5 Under IGRA, Class III gambling is legal on Indian land only if, in addition to other requirements, the gaming activity is:
 (B) located in a State that permits such gaming for any purpose by any person, organization, or entity,
and
 (C) conducted in conformance with a Tribal-State Compact entered into by the Indian tribe and the State. . . .
25 U.S.C. § 2710(d)(1) (emphasis added).
¶ 6 IGRA dictates that upon receiving a tribe's request to compact, the state "shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A). Because Class III gambling on Indian land, under IGRA, is only legal if the gaming activity is "located in a State that permits such gaming for any purpose by any person, organization, or entity," when a tribe requests a Compact, a question that often arises is whether the particular gambling activity requested by a tribe is "permitted" in the state, and thus is a proper subject of a Tribal-State Compact under IGRA.
¶ 7 In Attorney General Opinion 93-1, the Attorney General concluded, among other things, that "[b]ecause pari-mutuel horse race gambling is permitted in Oklahoma, the Indian Gaming Regulatory Act . . . requires the State to treat such gambling as a proper subject of a Tribal-State Compact, regardless of whether the wagering on horse racing occurs at the site of the race or at other than a race track location." In reaching this conclusion, Attorney General Opinion 93-1 recognized that in interpreting the Indian Gaming Regulatory Act, some federal courts have found that the meaning of the phrase "located in a State that permits such gaming for any purpose by any person, organization, or entity" when used in the context of Class III gaming, may, to some extent, be determined by looking at IGRA's legislative history relating to Class II gaming. The Act's legislative history indicates that the Senate committee reporting on the Act anticipated that the federal courts would:
 [R]ely on the distinction between State criminal laws which prohibit certain activities and civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in Cabazon.
S. Rep. No. 100-446, 100th Cong., 2d Sess. 6 (1988) (emphasis added).
¶ 8 In California v. Cabazon Band of Mission Indians,480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the Supreme Court examined the distinction between civil/regulatory law and criminal/prohibitory law, in the context of Pub.L. 280. TheCabazon Court determined whether the State of California, under the "civil" jurisdiction conferred by Pub.L. 280, could enforce its state bingo laws against the Cabazon Band. Under the bingo laws at issue, California limited legal bingo to charitable bingo games conducted by charitable organizations which use the funds earned for charitable purposes, and limited the prizes to $250.00 per game. Under the California Code, a violation of any of these limitations was a misdemeanor. In deciding whether the State of California could enforce its bingo laws on Indian land, the United States Supreme Court, referring to its prior decision in Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102,48 L.Ed.2d 710 (1976), noted that in the Bryan decision, it had interpreted Section 4 of Pub.L. 280 to grant states jurisdiction over private civil litigation involving reservation Indians, and not as granting general civil/regulatory authority to the State. Based on this distinction, the Supreme Court in Cabazon
reasoned that:
 [W]hen a State seeks to enforce a law within an Indian reservation under the authority of Pub.L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under § 2 [the section of Pub.L. 280 which confers criminal jurisdiction upon the States], or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.
480 U.S. at 208.
¶ 9 Then, referring to lower federal district court cases decided since Bryan v. Itasca County, the Supreme Court noted that those lower courts had drawn a distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws:
 [T]he Court of Appeals drew a distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws: if the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.
480 U.S. at 209 (emphasis added).
¶ 10 In applying this test, the Cabazon Court concluded that California's bingo laws were civil/regulatory rather than criminal/prohibitory.
¶ 11 Applying this analytical model to Oklahoma's horse racing statutes, we see that pari-mutuel horse race wagering is not contrary to the State of Oklahoma's public policy, but rather is specifically permitted by law — both on and off track — though highly regulated. Oklahoma Horse Racing Act, 3A O.S. 1991 andSupp. 1997, §§ 200-209.
¶ 12 One of the regulations imposed upon pari-mutuel horse race wagering in Oklahoma is the "county option" restriction placed upon the licensing authority of the Horse Racing Commission at3A O.S. 1991, § 209[3A-209], which provides that no pari-mutuel racetrack shall be licensed in any county unless a majority of the voters of that county have approved the conduct of pari-mutuel horse racing in said county:
 No pari-mutuel racetrack shall be licensed in any county unless the majority of the voters of said county, voting at an election held for that purpose, approve the conducting of pari-mutuel horse racing in said county. An election shall be called upon the filing of a petition with the county election board containing not less than ten percent (10%) of the qualified voters within any such county.
3A O.S. 1991, § 209[3A-209] (emphasis added).
¶ 13 The Oklahoma Horse Racing Act imposes a like "county option" regulatory restriction upon the off-track wagering facilities of organization licensees (racetracks licensed by the Oklahoma Horse Racing Commission), at 3A O.S. Supp. 1997, § 205.6a[3A-205.6a], which restricts off-track wagering conducted by organization licensees to counties in which the voters have approved the conduct of pari-mutuel horse racing:
 Any organization licensee shall file with the Oklahoma Horse Racing Commission its plan to conduct pari-mutuel wagering at a facility or facilities located outside the organization licensee's racing enclosure. Such pari-mutuel wagering may be conducted at any time as authorized by the Commission. The conducting of pari-mutuel wagering at a facility outside the organization licensee's racing enclosure is subject to the following:
 1. Pari-mutuel wagering shall be permitted only in a county which approves or has approved the conducting of pari-mutuel horse racing in that county pursuant to the provisions of Section 209 of this title[.]
3A O.S. Supp. 1997, § 205.6a[3A-205.6a](A) (emphasis added).
¶ 14 Thus we see that the Oklahoma Horse Racing Act permits pari-mutuel horse race wagering — both on and off track — but limits the Commission's ability to issue a license to racetracks in counties whose voters have approved pari-mutuel wagering. In like manner the Oklahoma Horse Racing Act restricts an organization licensee's ability to conduct pari-mutuel wagering at its off-track racing facilities, as their off-track wagering facilities can only be operated in counties whose voters have approved pari-mutual horse racing. 3A O.S. Supp. 1997, §205.6a[3A-205.6a]. Such regulatory restrictions on pari-mutuel wagering are not generally enforceable in Indian Country, unless permitted by federal law, such as under the IGRA. As noted above, Class III gambling on Indian land, under federal mandate, is only permitted to be conducted under a Tribal-State Gaming Compact. IGRA provides that any Tribal-State Compact negotiated under its authority may include provisions relating to:
 (i) the application of the criminal and civil laws and regulations of the Indian tribe or State that are directly related to, and necessary for, the licensing and regulation of such activity [as well as]
 (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe
necessary for the enforcement of such laws and regulations[.]
25 U.S.C. § 2710(d)(3)(C) (emphasis added).
¶ 15 Accordingly, a Class III gambling Compact to conduct off-track pari-mutuel horse races negotiated between the State of Oklahoma and a federally recognized Indian Tribe could provide for the application of State regulations — including the application of the State's county option restriction in Sections 205.6a and 209. If, however, a Compact negotiated between the State and the Tribe does not provide for the extension of such State limitations and regulations on the Tribe's Class III gaming, those limitations do not apply to the gaming conducted by the Tribe in Indian Country under the Compact.
¶ 16 In those cases in which a negotiated Tribal-State Compact for the conduct of pari-mutuel horse race wagering on Indian land makes the county option provisions of 3A O.S. 1991, § 209[3A-209] and Supp. 1997, § 205.6a applicable to such wagering, the Oklahoma Horse Racing Commission would be prohibited from authorizing an organization licensee (a racetrack licensed by the Oklahoma Horse Racing Commission) to simulcast its live horse races to an Indian tribe's off-track wagering facility located in Indian Country in a county that had not approved pari-mutuel horse racing.
¶ 17 On the other hand, in those instances in which a Tribal-State Compact negotiated under IGRA did not make the county option restrictions of State law applicable to the Tribe's gaming activity on Indian land, the Oklahoma Horse Racing Commission could lawfully authorize an organization licensee to simulcast its live horse races to a Tribe's off-track pari-mutuel wagering facility located in Indian Country in a county whose voters have not approved pari-mutual horse racing.
¶ 18 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Under the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, the applicability of the "county option" restrictions of 3A O.S. 1991, § 209[3A-209] and 3A O.S. Supp. 1997, § 205.6a[3A-205.6a] to tribal gambling in Indian Country is governed by the terms of a negotiated Tribal-State Compact.
 2. When a Tribal-State Compact negotiated under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, makes the "county option" restrictions of 3A O.S. 1991, § 209[3A-209] and 3A O.S. Supp. 1997, § 205.6a[3A-205.6a] applicable to pari-mutuel horse race wagering conducted by the compacting Indian Tribe in Indian Country, the Oklahoma Horse Racing Commission would be prohibited from authorizing an organization licensee (a racetrack licensed by the Oklahoma Horse Racing Commission) to simulcast its live horse races to the compacting Indian Tribe's off-track pari-mutuel racing facility located in Indian country in a county whose voters have not approved pari-mutual horse racing.
 3. When a Tribal-State Compact negotiated under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, between the State and a Tribe does not provide for the applicability of the "county option" restrictions contained in 3A O.S. 1991, § 209[3A-209] and 3A O.S. Supp. 1997, § 205.6a[3A-205.6a] to pari-mutuel horse race wagering conducted in Indian Country under the Compact, the Oklahoma Horse Racing Commission can lawfully authorize an organization licensee (a racetrack licensed by the Oklahoma Horse Racing Commission) to simulcast its live horse races to the compacting Indian Tribe's off-track pari-mutuel wagering facilities located in Indian Country, even when the Indian Tribe's off-track wagering facility is located in a county whose voters have not approved pari-mutual horse racing.
 W.A. DREW EDMONDSON ATTORNEY GENERAL
 NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL