# Supreme Court of the Navajo Nation

---

**Harold Billie, et al., Plaintiffs-Appellees,**

v.

**John Abbott, as Director of Utah**
**Office of Recovery Services, Defendant-Appellant.**
**Decided November 10, 1988**

---

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

R. Dennis Ickes, Esq., Salt Lake City, Utah, for the Appellant; Steven Boos, Esq., DNA-People's Legal Services, Inc., Mexican Hat, Utah, for the Appellees.

Opinion delivered by AUSTIN, Associate Justice.

This suit arose when John Abbott, a Utah official, intercepted the federal tax returns of Navajos living on the Navajo Reservation and whose children had received Aid to Families with Dependent Children (AFDC) benefits.[1] The Navajo plaintiffs claim that their rights protected by federal laws were violated when Abbott caused the interceptions and when Abbott used Utah law to decide their child support obligations. A default judgment was entered against Abbott for his failure to comply with an order compelling discovery. On appeal from that judgment, Abbott raised these issues: (1) Whether the Navajo district court has subject matter jurisdiction in this case; (2) Whether the Navajo district court has personal jurisdiction over Abbott; (3) Whether the United States is an indispensable party to this case; (4) Whether this suit is properly maintained as a class action; (5) Whether the default judgment was properly entered; (6) Whether the default judgment amount is based upon reliable evidence; and (7) Whether plaintiff(s) is entitled to attorney's fees and costs.

## I. *Facts*

Harold Billie, his ex-wife Patsy (not a party), and all class members, (plaintiffs), are enrolled Navajos living on the Utah side of the Navajo Reservation.[2] Plaintiffs have had their federal income tax returns intercepted by Abbott as a means of repaying Utah for child support payments made to plaintiffs' children

---

1. Pub.L. No. 271, §§ 401 *et seq.*, 49 Stat. 627 *et seq.*, Codified as Title IV-A of the Social Security Act; 42 U.S.C. §§ 601 *et seq.*

2. The Navajo Indian Reservation is located within the States of Arizona, Utah and New Mexico.

under the AFDC program.

Navajo code law and Navajo common law regulate the domestic relations (i.e., divorce and child support) of Navajos living in Navajo Indian Country. Using these laws, Billie and Patsy were divorced in Navajo court on April 11, 1983. The court gave Patsy custody of the children, and because Billie was unemployed, the court ordered Billie to "pay reasonable child support when he is employed and the monthly amount to be arranged by the parties." *Billie v. Billie*, No. SR-CV-112-83 (Divorce Decree). Billie and Patsy never returned to court to set the amount of Billie's child support payments. Instead, Patsy, without Billie's knowledge, applied directly to Utah for AFDC benefits.

The AFDC program is a federal matching program designed to financially assist needy children; usually children who are not supported by their fathers. A state participant must submit a plan for approval by the federal government. Upon approval of its plan, a state can be reimbursed for any benefits it has paid to eligible applicants. Utah's plan was approved by the federal government.

Utah processed Patsy's application for AFDC benefits using its plan and laws established specifically for deciding the amount of support to be paid in the absence of a court order. Federal law allows a state to use its administrative procedures to set the amount of AFDC benefits to be paid to support a child where there is no court order. 42 U.S.C. § 656 (a)(2)(b). These federal laws governing AFDC benefits do not mention Indians or Indian reservations. There are no federal guidelines available that would guide the states in administering the AFDC program when Indians living on reservations apply for AFDC benefits. Patsy's application was approved and the Billie children received benefits.

Title 42 U.S.C. § 656 states that any money a state pays to support a child under the AFDC program shall constitute an obligation owed to that state by the individual responsible for providing such support. Section 656 also allows a state to collect "under all applicable State and local processes." To collect the money Billie owed Utah, Abbott applied to the United States Secretary of the Treasury, using 42 U.S.C. § 664, to intercept Billie's federal income tax refunds. Section 664 directs the state to notify the Secretary if an individual owes the state past-due support. If there is money payable from the Treasury to that individual, the Secretary can withhold an amount equal to that past-due support and pay that amount to the state. The Secretary sent Utah the amounts Billie owed the state from Billie's 1984 and 1985 federal income tax refunds.

On April 28, 1987, Billie sued claiming that because Utah is barred from extending its laws into the Navajo Nation, Utah's use of its administrative procedures to determine plaintiffs' child support obligations was an invasion of rights secured to Navajo tribal members under the Navajo Treaty of 1868, 15 Stat. 667, and other federal laws. Billie alleged a cause of action under 42 U.S.C. § 1983 and a class suit under Rule 23(b) (2) of the Federal Rules of Civil Procedure. Billie wants to stop Utah's tax interceptions because he claims that Utah's administrative procedures cannot lawfully be applied to Navajos living on

the reservation. Billie wants all intercepted federal tax refunds returned and his costs and attorney's fees paid by Utah.

On May 13, 1987, a request for production of documents necessary to determine the class was served on Abbott. Abbott then moved to dismiss the suit which was denied. After arguing the motion to dismiss, Abbott's counsel told the court that the discovery request would be answered. On August 21, 1987, the court granted Billie a preliminary injunction.

On September 8, 1987, Billie moved to compel discovery because Abbott had not answered the request for production. On September 23, 1987, Abbott was ordered to answer discovery within 10 days or face a default judgment. Abbott received this order on October 1, 1987, but before receiving the order, Abbott appealed the orders granting the preliminary injunction and denying the motion to dismiss. The next day Abbott moved for protection from discovery until this Court had decided the appeals filed on October 1, 1987. The district court did not act upon this motion. This Court dismissed the two appeals on October 28, 1987.

On November 4, 1987, the court granted Billie a default judgment because of Abbott's noncompliance with the order compelling discovery. Billie was awarded $218,278.66 to cover intercepted federal tax refunds and $18,750.00 for attorney's fees. Abbott was permanently enjoined from intercepting the federal tax returns of class members.

## II. *Subject Matter Jurisdiction*

### A

Abbott concedes that the Navajo Nation has exclusive jurisdiction over the domestic relations of Navajos living on the reservation. Abbott, however, claims that if Navajos apply for AFDC benefits, then the AFDC legislation gives Utah pre-emptive and exclusive jurisdiction to decide their support obligations despite both parents and the children living on the reservation. Abbott's claim would divest the Navajo Nation of its exclusive jurisdiction over child support decisions involving Navajos living on the reservation when they apply for AFDC benefits. Abbott argues that, because the AFDC legislation has divested the Navajo Nation of jurisdiction, the Navajo district court does not have jurisdiction over claims against him.

The issue, in cases where Navajos apply for AFDC benefits, is whether the AFDC legislation has divested the Navajo Nation of its exclusive power to decide child support obligations of its members who live on the Navajo Reservation, and has that legislation vested exclusive jurisdiction in Utah to make those decisions. We find no such abrogation in the AFDC legislation; thus, we hold that the district court has jurisdiction over Billie's claims against Abbott under this issue.

Implicit in the Treaty of 1868 is the understanding that the internal affairs of the Navajo people are within the exclusive jurisdiction of the Navajo Nation govern-

ment. *Williams v. Lee*, 358 U.S. 217, 221-222 (1959). And, "since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 175 (1973). The sovereignty retained by an Indian tribe includes "the power of regulating [its] internal and social relations." *United States v. Kagama*, 118 U.S. 375, 381-382 (1886). Because Navajo domestic relations is the core of the tribe's "internal and social relations," the Navajo Nation has exclusive power over domestic relations among Navajos living on the reservation. *See, e.g., Fisher v. District Court*, 424 U.S. 382 (1976).

Congress can impose through legislation certain limitations on Navajo sovereignty because Congress has special authority over Indian affairs. *Johnson v. Navajo Nation*, 5 Nav. R. 192, 198 (1987). If a federal statute is to limit Indian sovereignty or override Indian rights, Congress must clearly show its intent to do so before a court will allow such intrusion. *Santa Clara Pueblo v. Martinez*, 436 U.S.. 49, 72 (1978). Tribes and the federal government have a special relationship from which the states are excluded unless Congress clearly allows the states to treat Indians as a part of the general community. *Bryan v. Itasca County*, 426 U.S. 373 (1976). Such congressional intent must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history. *Id.* at 393. The presumption is that a federal statute is not intended to make a radical change in Indian affairs, thus federal statutes should be construed in favor of retained tribal self-government. See *Bryan, id.* ; *Santa Clara Pueblo, id.* The federal policy embodied in numerous federal statutes and federal court decisions is that the Indian tribes must exercise the full extent of their sovereignty. *See Santa Clara Pueblo, id.*

Congress has not clearly expressed its intent that 42 U.S.C. § 656 (determination of child support absent a court order), nor any section of the AFDC legislation, is meant to abrogate Indian tribal sovereignty. A congressional intent to allow states to decide the child support obligations of Indians living on a reservation is not clearly expressed on the face of the AFDC legislation. As a general statute, 42 U.S.C. §§ 601 *et seq.*, cannot be read as expressly abrogating the exclusive powers of the Navajo Nation to decide its members' domestic relations; thus, the AFDC legislation does not expressly sanction Utah's interference in Navajo domestic relations. In fact, neither Indians nor Indian tribes are mentioned in the AFDC legislation.

Some general federal statutes which do not mention Indians or Indian tribes have been applied to Indian tribes. *See, e.g., Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800 (1976). Even a statute of this nature, however, is required to show a congressional intent to intrude on Indian rights through its surrounding circumstances and legislative history. *Colorado River*, 424 U.S. at 811-813; *Bryan*, 426 U.S. at 393. Aside from the broad statement that "The AFDC legislation is a statute of general application and as such it was intended to apply to all residents of the United States, including Indian residents," Abbott

has not shown any legislative history nor any surrounding circumstances of the AFDC legislation which would clearly show that Congress intended to intrude on tribal domestic relations. Because the AFDC legislation does not show an intent to abrogate tribal sovereignty, either clearly on its face or through its surrounding circumstances and legislative history, the Navajo Nation has retained its exclusive jurisdiction over tribal members' child support obligations.

Cases may arise where tribal self-government may conflict with a federal law of general application. Even in these situations, "the Supreme Court has consistently recognized the unique status of tribes, Indians, and their lands, and has required that the congressional purpose of a conflicting law clearly require that it apply to Indians before Indian rights are held implicitly infringed." F. Cohen, *Handbook of Federal Indian Law*, 286 (1982 ed.). The AFDC legislation clearly does not intend a state to be the only sovereign to decide the child support obligations of Indians living on a reservation. Abbott's reliance on *Colorado River* to advance this argument is unpersuasive.

In *Colorado River,* the Court held that states have jurisdiction over Indian water rights' issues under the McCarran Amendment, 43 U.S.C. § 666. Like the AFDC legislation, the McCarran Amendment did not mention Indians, yet, unlike the AFDC legislation, the legislative history of the McCarran Amendment was replete with references to its effect on Indians. Regardless of this difference *Colorado River* is best confined to the uniqueness of water adjudication, *see Arizona v. San Carlos Apache Tribe*, 463 U.S. 545 (1983), rather than being applied to a question of a state's attempt to assert jurisdiction over an Indian tribe's internal affairs.

The Navajo Nation's exclusive power to regulate domestic relations among Navajos living within its borders is beyond doubt. The Navajo Nation has codified law and case law regulating Navajo domestic relations. And the Navajo Nation's right to make its own laws and be ruled by them is an established principle in Indian law. *Williams v. Lee*, 358 U.S. 217 (1959); *United States v. Wheeler*, 435 U.S. 313 (1978). Accordingly, absent explicit congressional authorization, if a state infringes on the right of reservation Indians to make their own laws and be governed by them, that state has acted outside its authority. *See Williams v. Lee*, 358 U.S. at 220-223; *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. at 173. The AFDC legislation does not explicitly authorize Utah to decide tribal domestic relations, thus, Utah's determination of Billie's support obligation is an unlawful interference with Billie's right to be regulated by Navajo law. Billie can seek the protection of Navajo law to preserve his right to have his support obligation decided by Navajo law.

## B

Abbott argues that Utah's implementation of the AFDC legislation would be frustrated if he cannot use Utah law to decide the amount of child support obligations of Navajos, especially if there is no Navajo court order. Abbott predicts

more obstacles if he is required to pursue collection through the Navajo courts. In narrow cases, a state may extend its laws onto a reservation to protect its legitimate interest. *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. at 179. But even there the state must show that essential tribal relations are not involved and that rights of tribal members will not be jeopardized. *Williams v. Lee*, 358 U.S. at 219. Although Utah has an interest in serving eligible Navajo children, the manner in which it determines eligibility (use of non-Navajo law) implicates essential Navajo tribal relations, and in the end Utah jeopardizes the rights of Navajos to have their support decided by Navajo courts.

Only Navajo courts using Navajo law can decide Billie's child support obligation. Only Navajo courts can be used to collect past-due support owed by Navajos living on the Navajo Reservation. Navajo self-government mandates it. If Utah laws are used to decide the child support obligations of Navajos, then, Utah laws would supplant Navajo laws and firmly established Navajo cultural practices on domestic relations.

Navajo statutes and case law reflect Navajo culture and the unique circumstances and needs of the Navajo people living on the reservation. State determinations of tribal domestic relations, no matter how narrow the intrusion, are always hostile to and in conflict with the needs of the Indian people. For this very reason we disagree with the decision in *New Mexico v. Jojola*, 99 N.M. 500, 660 P.2d 590 (1983), *cert. denied*, 464 U.S. 803 (1983); a case cited by Abbott. There the Court clearly ignored an Indian tribe's right to regulate its internal relations.

A further danger is that state decisions on Navajo domestic relations may cause a decline in Navajo court authority over Navajos and over Navajo domestic relations. *Williams v. Lee*, 358 U.S. at 223; *Fisher v. District Court*, 424 U.S. at 388. Utah's decision on Billie's support obligation would not only adversely affect Navajo authority over internal tribal matters, but it may encourage Navajos to go directly to Utah in hopes of receiving a larger award. State interference would indeed hinder the development of Navajo domestic relations law. There is clearly infringement upon Navajo self-government when a state official decides the child support payments of Navajos living on the reservation.

Federal statutes passed to benefit Indians are construed to favor the Indians. *Alaska Pacific Fisheries v. United States*, 248 U.S. 78 (1918). The policy for this construction is "rooted in the special trust relationship between the United States and Indian tribes." F. Cohen, *Handbook of Federal Indian Law*, 224 (1982 ed.) . *See also Tulee v. Washington*, 315 U.S. 681 (1942); *Carpenter v. Shaw*, 280 U.S. 363 (1930). There is no reason why this same policy should not support construing a general federal statute consistent with Congress' goal of tribal self-government. Utah and the Navajo Nation, no doubt, can cooperate so that the AFDC legislation is implemented in a way that benefits Navajos living on the reservation without violating the federal purpose. The AFDC legislation is flexible enough so that Abbott can come to Navajo courts to adjudicate the support amount, or Utah can require Navajo applicants to go first to Navajo courts for

support decisions. In this case the Navajo court had continuing jurisdiction over Billie's support obligation, and Utah, which had no jurisdiction, should have required Patsy to return to the Navajo court.

Once a Navajo court has decided the amount of child support that should be paid, and after AFDC benefits are paid, Utah again must pursue its arrearage collection through the Navajo courts. This again is not contrary to the AFDC legislation which authorizes a state to use courts for collection. See 42 U.S.C. § 656 (a)(1). Certainly, cooperation between the Navajo Nation and Utah would have far better results than costly litigation.

### C

Abbott also claims that under Utah's sovereign immunity statute, UTAH CODE ANN. § 63-30-3 (Supp. 1979), Billie is barred from suing a Utah official in Navajo court. This would be true if Billie is strictly a resident of Utah suing in Utah state court and not a resident of the Navajo Reservation. A suit against a state in its own court is governed by the state's own laws. The question remains whether the Navajo court should recognize Utah's defense of sovereign immunity.

Although Abbott has not argued that any federal law may have limited the power of the Navajo Nation over a state official, we feel obligated to make that inquiry. Our review of the Treaty of 1868 has not disclosed any such limitation on Navajo sovereignty. And we have not found any federal statute with such limitation. The fact is suits against state political sub-divisions in tribal courts are not unknown. *See, e.q., National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845 (1985) (question of whether tribal court has jurisdiction over state school); *Hubbard v. Chinle School Dist. Nos. 24/25*, 3 Nav. R. 167 (1982).

The issue concerning a suit against a state in another state's court was decided in *Nevada v. Hall*, 440 U.S. 410 (1979). In *Hall* the Court found that when a state is sued in another sovereign's court, the rule governing state suability in its own court is not controlling because "[s]uch a claim necessarily implicates the power and authority of a second sovereign." *Id.* at 416. The Court said that if a state's sovereign immunity is to be recognized by the second sovereign, then "its source must be found in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity." *Id.* at 416

The Navajo Nation does not grant immunity from suit to any state as a matter of comity. We have also not found any agreement, express or implied, between the Navajo Nation and Utah which would require this Court to recognize Utah's defense of sovereign immunity. We have previously said that the states of the Union are foreign governments in relation to the Navajo Nation. *Hubbard*, 3 Nav. R. at 169. In *Hubbard* we further ruled that the Navajo Nation courts have jurisdiction over suits against a state. *Id.* at 170. The reverse, however, a suit against the Navajo Nation in Utah court, would be barred by tribal immunity from suit,

not as a matter of comity, but based upon federal pre-emption.

## III. *Personal Jurisdiction*

### A

The question here is whether Abbott has caused an action to occur within the territorial jurisdiction of the Navajo Nation so that he is subject to Navajo court jurisdiction. We hold that he has.

At the outset we establish that a defendant may cause personal injury actionable in Navajo court without ever having set foot on Navajo soil. In a prior decision this Court said that the Navajo courts have jurisdiction "over any person doing injury within the Navajo Nation...." *Deal v. Blatchford*, 3 Nav. R. 159, 160 (1982); *Accord, Keith v. Allred*, 3 Nav. R. 191 (Chinle Dist. Ct. 1981). We further find that claims brought under 42 U.S.C. § 1983 are best characterized as personal injury actions. *Wilson v. Garcia*, 471 U.S. 261 (1985).

Tribal members residing on a reservation have certain rights protected by federal law while they exercise those rights within the boundaries of the reservation. For example, a state may not tax a Navajo's income derived from Navajo Reservation sources, *McClanahan v. Arizona State Tax Comm' n*, 411 U.S. 164; a civil suit against a Navajo residing on the Navajo Reservation must be brought in Navajo court, *Williams v. Lee*, 358 U.S. 217; and Navajos residing on the reservation have the right to have a Navajo court decide their domestic relations, *Fisher v. District Court*, 424 U.S. 382. These rights guaranteed to tribal members have no effect off the reservation, because "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been subject to nondiscriminatory state law otherwise applicable to all citizens of the state." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-149 (1973) .

Whenever any right that an enrolled Navajo has while residing on the Navajo Reservation is abrogated by a state official, that Navajo has suffered a personal injury. *See Wilson v. Garcia*, 471 U.S. 261 (1985). When those rights that exist only within the boundaries of the reservation are violated, the injury occurs on the reservation, because those rights generally are not effective off the reservation. *Mescalero Apache Tribe*, 411 U.S. at 148-149.

Domestic disputes arising among Navajos residing on the reservation are within the exclusive jurisdiction of the Navajo courts. *Fisher v. District Court*, 424 U.S. 382; *Arviso v. Dahozy*, 3 Nav. R. 84 (1982). If a state official interferes in the domestic disputes of Navajos living on the reservation then the official has caused an action to occur within the Navajo Nation. This is true although the state official may not have entered the reservation. A Navajo's right to have his domestic dispute heard by a Navajo court is effective while he resides on the reservation. Because of the Navajo Nation's exclusive jurisdiction over Navajo domestic relations, Billie has a right to have his child support decided only by a Navajo court. When Abbott used Utah administrative procedures to decide

Billie's support obligation, he denied Billie a right to present evidence on culture and traditions, and other factors unique to Navajo people. This denial has caused Billie a personal injury actionable in a Navajo court and that injury took place on the reservation.

We next consider Abbott's argument that unless he has minimum contacts with the Navajo Nation, due process dictates that the Navajo Nation has no personal jurisdiction over him. The United States Supreme Court cases stating that a defendant must have minimum contacts with the forum state to be brought into the state's court are based on the fourteenth amendment due process clause of the United States Constitution. *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291 (1980). Because the United States Supreme Court has held that the Indian tribes are not constrained by the Bill of Rights in the United States Constitution, *Santa Clara Pueblo*, 436 U.S. at 56; *Talton v. Mayes*, 163 U.S. 376 (1895), we are not bound by the rationale nor the holding of any case construing those amendments.

Despite the inapplicability of the United States Constitution, the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1302(8), and the Navajo Bill of Rights (NBR), 1 N.T.C. § 3, both require that Abbott must be given due process. Furthermore, in at least one case a Navajo court mentioned minimum contacts. See *Peterson v. Ford Motor Credit Co.*, 2 Nav. R. 36 (Crownpoint Dist. Ct. 1979). Due process under the ICRA and the NBR must be interpreted in a way that will enhance Navajo culture and tradition. Navajo domestic relations, such as divorce or child support, is an area where Navajo traditions are the strongest. To enhance the Navajo culture, the Navajo courts must synthesize the principles of Navajo government and custom law. From this synthesis Navajo due process is formed.

When Navajo sovereignty and cultural autonomy are at stake, the Navajo courts must have broad-based discretion in interpreting the due process clauses of the ICRA and NBR, and the courts may apply Navajo due process in a way that protects civil liberties while preserving Navajo culture and self-government. Abbott has interfered with the domestic relations of Navajos, a subject with strong cultural ties. This has caused personal injury unique to Navajos residing on the reservation. We have just held that this personal injury occurred on the Navajo Reservation, thus, Abbott has made "minimum contact" with the Navajo Nation to satisfy the requirement of Navajo due process under the ICRA and under the NBR.

B

Abbott also asserts that service of process on him outside the reservation was insufficient because he did not engage in activities on the Navajo Reservation which would subject him to personal jurisdiction in Navajo court.

Service was made on Abbott by certified mail. Such service was proper. Rule 3, NRCP (1978 ed.); *Peterson v. Ford Motor Credit Co.*, 2 Nav. R. at 41. A state official is amenable to the service of process of the Navajo courts if that official

has caused an action to occur within the territorial jurisdiction of the Navajo Nation. Abbott has caused Billie an injury on the Navajo Reservation. The service notified Abbott of the suit against him, so it complied with all due process requirements.

## IV. *The United States as an Indispensable Party*

Abbott argues that the United States is an indispensable party to this action because federal legislation is at issue, and if the Navajo court rules for Billie, the rights of the United States will be impaired. Simply because federal legislation is at issue does not make the United States an indispensable party. "[I]mportant questions about legislation are [often] presented to courts without the sovereign being joined as an indispensable party." *Halona v. MacDonald*, 1 Nav. R. 189, 203 (1978).

A party is indispensable to a lawsuit if that party has an interest in the action, and the disposition of the action in his absence may impair his ability to protect that interest. Fed. R. Civ. P. 19(a). An indispensable party is one whose relationship to the controversy is such that any decree entered would affect that party's rights. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305 (5th Cir. 1986).

We hold that the United States is not an indispensable party to this lawsuit. No interest of the United States is impaired or affected by requiring Abbott to litigate Navajo child support obligations in Navajo court. Neither does such a requirement burden Utah, making implementation of the AFDC legislation more difficult. The AFDC legislation is not being undermined. Instead, the AFDC legislation is being clarified as it is applied to tribal residents of a reservation.

## V. *The Propriety of this Suit as a Class Action*

Abbott claims that because the Navajo Tribal Code and the Navajo Court Rules say nothing about class actions, such an action cannot be brought in a Navajo court. In the alternative, Abbott argues that even if Rule 23 of the Federal Rules of Civil Procedure is applicable in Navajo court, Billie's complaint failed to meet the requirements of a class action.

Billie argues that 7 N.T.C. § 204 allows the Navajo courts to use the Federal Rules of Civil Procedure. Billie also asserts that when the district court entered the default judgment, the effect was the same as if Abbott had admitted all the allegations in the complaint. Therefore, unless the district court abused its discretion in entering the default judgment, the certification of the class must remain undisturbed.

Section 204 does authorize the Navajo courts to use any applicable law of the United States in any controversy, so the district court's use of Rule 23 of the Federal Rules of Civil Procedure was proper. Class actions are often a desirable method of dispute resolution, because they eliminate separate suits thereby providing for judicial efficiency.

To maintain a class action under Rule 23 of the Federal Rules of Civil Procedure, four criteria must be met: the class must be so numerous that joinder is impracticable; there must be questions of law or fact common to the class; the claims or defenses of the representative party must be typical of the claims or defenses of the class; and the representative party must fairly and adequately protect the interests of the class. Billie failed to make a positive showing that his lawsuit met the criteria for class action suits. This failure may have been partly a result of Abbott's failure to provide the necessary documents to Billie for assessment of the class. Therefore, the district court's decree that the action was properly maintained as a class action is erroneous.

Even though all allegations in a complaint are generally taken as true in a default judgment, *Postal Ben. Ins. Co. v. Johnson*, 165 P.2d 173, 178 (Ariz. 1946), Billie's bald assertions regarding the class are not enough. Even in a default judgment the plaintiff needs facts to prove that his suit qualifies as a class action. We reverse the district court's ruling on the class action and we remand so that Billie may properly qualify his suit as a class action.

## VI. *The Propriety of the Default Judgment Entry*

The district court determines primarily whether a party's failure to comply with a court's order was willful, and whether the circumstances were so aggravated as to justify a default judgment. *See Chavez v. Tome*, 5 Nav. R. 183 (1987); *Four Corners Auto Sales v. Begay*, 4 Nav. R. 100, 103 (1983). The choice of the appropriate discretionary sanction for ignoring a court order compelling discovery is primarily the responsibility of the trial judge, and the judge's decision cannot be reversed absent an abuse of discretion. *Chavez*, 5 Nav. R. at 186. The district court stated in its conclusions of law that Abbott's disobedience to the discovery order was willful, in bad faith, and represented contempt of court. In evaluating the district court finding, the question is not whether this Court would have entered a default judgment, but whether the district court abused its discretion in doing so. However, where a judgment involves a default, our review should be particularly scrupulous lest the district court resort too quickly to this extreme sanction which amounts to a judgment against the defendant without an opportunity to be heard on the merits.

A trial on the merits is strongly favored over a default judgment, *see, e.g., Wilson v. Wilson*, 3 Nav. R. 145, 147 (1982). However, a default judgment protects a diligent party from continual delay and uncertainty as to his rights. Therefore, in deciding whether to grant a default judgment or not, a court must strike a balance between the need to prevent delay and the sound public policy of adjudicating cases on the merits. *Chavez*, 5 Nav. R. at 188.

The most severe sanction for a failure to obey a court order is a default judgment, and a court should impose such a sanction only in the most extreme circumstances. The evidence does not support the harsh sanction of a default judg-

ment here. Abbott's conduct was not egregious enough to warrant a default judgment against him; he did not flatly refuse to comply, or constantly fail to meet deadlines or obey orders. The facts show that Abbott had filed two appeals prior to receiving the order compelling discovery. Immediately after receiving the order, Abbott moved for an order seeking protection from discovery pending this Court's decision on the two appeals. The district court did not act on Abbott's motion. Although the appeals were dismissed by this Court, Abbott's actions were done in good faith. We reverse the judgment of default entered by the district court.

## VII. *The Amount of the Default Award*

Because we reverse the default judgment, the default award amount is also reversed, and we need not reach the issue of whether the amount was based upon reliable evidence. We also reverse and vacate the award of attorney's fees for the same reason.

The Window Rock District Court is affirmed in part; reversed in part; and the case is remanded to that court.