In the Matter of 1981, 1982, 1983, 1984 and 1985 DELINQUENT PROPERTY TAXES OWED TO the CITY OF NOME, ALASKA.

No. S–2651.

Supreme Court of Alaska.

Sept. 22, 1989.

Rehearing Denied Dec. 5, 1989.

Lawrence A. Aschenbrenner, Robert T. Anderson and Bart K. Garber, Native American Rights Fund, Anchorage, and Lloyd Miller, Sonosky, Chambers, Sachse & Miller, Anchorage, for appellant.

Brooks W. Chandler, Hicks, Boyd, Chandler & Falconer, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

COMPTON, Justice.

The City of Nome (City) brought an action *in rem* to foreclose on two tracts of land owned by Nome Eskimo Community (NEC), a group of Natives organized under the Indian Reorganization Act (IRA), 25 U.S.C. §§ 461–479. NEC moved to dismiss the action on a number of grounds, and the motion was denied.

On appeal, NEC argues, among other things, that section 16 of the IRA bars the city from foreclosing on lands held by NEC without NEC's consent.[1] We agree, and therefore reverse.

I. FACTS AND PROCEEDINGS

NEC, a group of Alaska Natives sharing "the common bond of living together in the Town of Nome," is organized under the IRA. NEC owns two tracts of land in the City of Nome. On one tract it operates a freezer plant and a cold storage facility. The other tract is the site of NEC's headquarters building, which houses the group's offices, meeting rooms, workshop, warehouse, and bingo operation. Both tracts were purchased in part with funds from a federal grant under the Indian Self–Determination and Education Assistance Act of 1975, Pub.L. 93–638, 88 Stat. 2203 (codified as amended in scattered sections of U.S.C. titles 5, 25, 42 and 50 App.).

The City has assessed real property taxes on NEC's lots. NEC has not paid the taxes.

In November 1986, the City filed in superior court a general foreclosure proceeding *in rem* against the properties on its foreclosure list. The foreclosure list included both tracts owned by NEC. The list stated that taxes were owing on the properties for 1983, 1984 and 1985.

NEC moved to dismiss the action against its lots. The court denied NEC's motion to dismiss and granted the City's motion for declaratory judgment, declaring NEC's lots not exempt under federal law from the City's property tax. In March 1988, the court entered a judgment and decree of foreclosure against NEC's lots. In May 1988, following oral argument, the court

1. The meaning of section 16 was expressly reserved for later consideration in *Native Village* of *Stevens v. Alaska Management & Planning,* 757 P.2d 32, 41 n. 22 (Alaska 1988).

awarded the City attorney's fees against NEC in the sum of $8,500.

NEC appeals.

## II. DISCUSSION

### A. SECTION 16 OF THE IRA.

1. Section 16 of the Indian Reorganization Act Bars the City from Foreclosing on NEC Lands Without the Consent of NEC.

NEC contends that section 16 of the Indian Reorganization Act (IRA), 25 U.S.C. § 476, bars the City from foreclosing on its lots.[2] Section 16 provides in part:

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: ... to prevent the sale, disposition, lease, or encumbrance of tribal lands, interest in lands, or other tribal assets without consent of the tribe....

25 U.S.C. § 476.

The Constitution of the Nome Eskimo Community, adopted pursuant to section 16 of IRA, provides in part: "The Community shall have the following powers: ... to stop any giving or taking away of Community lands or other property without its consent...."

Regardless of whether NEC is a "tribe" for other purposes, there can be little doubt that it is a "tribe" for purposes of this provision. As this court recognized in *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d at 41 n. 22 (Alaska 1988), the provision applies to "[e]ntities organized under Section 16 of the IRA."

The City argues that the provision in question was intended to protect IRA tribes from decisions by the Department of the Interior disposing of tribal lands and assets without the tribe's consent. The City argues that the provision therefore should have no application to state action.

No case has directly considered the question whether the provision applies to state action.[3] In *Fort Mojave Tribe v. San Bernadino County*, 543 F.2d 1253 (9th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977), the court was faced with the question whether a state tax ran afoul of the limitation by encumbering tribal assets without the consent of the tribe. *Id.* at 1256. The court apparently assumed that state as well as federal action was limited by the provision, but held that the tax did not constitute an encumbrance of tribal assets. *Id.*

The City's argument finds some support in the legislative record. Representative Howard, a chief sponsor of the bill in the House, offered the following explanation of the provision in question:

---

**2.** The superior court questioned whether the two tracts were owned by the Nome Eskimo Community as a nonprofit corporation incorporated under state law, or as an organization created pursuant to Section 16 of the Indian Reorganization Act. Nome Eskimo Community (NEC) was organized pursuant to Section 16 of the Indian Reorganization Act of 1934, as amended. 25 U.S.C. §§ 473a, 476 (1983 & Supp. 1989) Nome Eskimo Community Incorporated (NECI) was incorporated under AS 10.20.151, and is a not-for-profit corporation as defined by § 501(c)(3) of the Internal Revenue Code. I.R.C. § 501(c)(3) (Supp.1989).

The Board of Equalization of the City of Nome found that NEC was organized pursuant to Section 16 of the Indian Reorganization Act, and that the tracts were acquired by NEC. The Board's findings are not challenged on appeal, and there is nothing in the record to suggest that these findings are erroneous in any respect.

**3.** A related question was considered in *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949). In *Hynes*, the U.S. Supreme Court stated that the language limiting transfers of land "would be effective only when there has been specific recognition by the United States of Indian rights to absolutely control tribal lands." 337 U.S. at 107, 69 S.Ct. at 981, 93 L.Ed. at 1249.

The court's inquiry in *Hynes* was whether a federal grant of valuable fishing rights to an Alaska IRA tribe was revocable, that is, whether the government retained some degree of *control* over the rights. The court noted that Congress had the power to convey a title in fee simple, as well as the power to convey lesser rights. 337 U.S. at 103–04, 69 S.Ct. at 979, 93 L.Ed. at 1240. Thus, the term "absolute control" refers to absolute control as against the federal government. Since NEC has a fee simple in the lots in question, for purposes of *Hynes* it appears to have "absolute control."

Among the most important powers conferred by this section is that which would prevent the sale, disposition, lease, or encumbrance of tribal lands or assets without the consent of the tribe. Under existing law, tribal moneys may be appropriated for the expenses of the Indian Service. It has been estimated that since 1900 the Government has spent $500,-000,000 of tribal money in per capita payments and administrative costs. Much of this money has gone to pay for routine activities of the Indian Service over which the Indians have exercised no control whatever, much has been spent for ill-advised irrigation projects which have benefited the whites rather than the Indians, without the consent of the tribe.

The Indians should unquestionably have a voice in the spending of their own money. The present system is in effect a totally indefensible system of "taxation without representation" and has led to the profligate and unproductive expenditure of vast sums of money. Most of this huge expenditure represented Indian capital, derived either from the sale of land or other assets or from claims arising out of Government mismanagement of Indian property. It should be axiomatic that no Indian capital should be spent for any purpose except productive development of Indian property or enterprise. The expenditure of these vast sums of capital for routine administration or for per capita doles should be stopped. The bill would give the Indians a veto power over such expenditures.

78 Cong.Rec. 11,731 (1934).

This view of Section 16 finds further support in the testimony of John Collier, Commissioner of Indian Affairs, in hearings before the House Committee on Indian Affairs. Reading from an earlier version of this section, he stated:

No disposition of any tribal or community lands or any interest therein or any right of use thereto shall be made without the consent of the tribe or community.

In other words, under existing law, in any one case, the Secretary of the Interior can rent, lease, alienate tribal assets;

under this new section that power would be taken away from him and would make all disposal subject to tribal consent.

*Readjustment of Indian Affairs: Hearings on H.R. 7902 Before the House Committee on Indian Affairs*, 73d Cong., 2d Sess.1989 (1934).

The following exchange in the Senate Committee hearings suggests a broader reading of the provision:

Senator O'MAHONEY. But what you are saying here is that the constitution shall vest in some person—what? The following rights and powers. And then you undertake to enumerate those powers. The first one that you enumerate is the right to employ counsel. The second one is the right to prevent individuals from selling and disposing of their property. Then you come to a third one and it is to represent the tribe, and that seems to me to be hanging up in the air.

The CHAIRMAN. The second one you stated incorrectly.

Senator O'MAHONEY. Have I?

The CHAIRMAN: It is not to prevent them from selling individual lands, it is tribal lands.

Senator O'MAHONEY. Yes, that is right; tribal lands.

*To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self–Government and Economic Enterprise: Hearings on S. 2755 and S. 3645 Before the Senate Committee on Indian Affairs*, 73d Cong., 2d Sess. 247 (1934), *quoted in Hynes v. Grimes Packing Co.*, 337 U.S. 86, 107 n. 29, 69 S.Ct. 968, 981 n. 29, 93 L.Ed. 1231, 1249 n. 29 (1948).

The specific references to this provision in the legislative history fairly suggest that Congress had before it a narrow problem: The appropriation of Indian assets by the Secretary of the Interior. But the general history of the IRA suggests that Congress was confronted by a far broader problem.

During the late 19th and early 20th centuries, the rapid settlement and development of the West demanded that Indian land be made available for acquisition by

whites. F. Cohen, *Handbook of Federal Indian Law* 128 (1982). Legislation answering this demand found its justification in the policy of allotment and assimilation. *Id.* Reservations were to be broken down into parcels, which were to be allotted to individual tribal members. *See* General Allotment (Dawes) Act of 1887, ch. 119, 24 Stat. 388. The individuals would be transformed into farmers or livestock owners. Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934*, 70 Mich.L.Rev. 955, 959 (1972). In this manner would the Indian "be absorbed into the mainstream of American life and the 'savagery' represented by tribal autonomy be destroyed." Cohen, supra, at 128–29.

The allotment policy proved successful in separating Indians from their lands. *Id.* at 136–37. Between 1887 and 1934 tribal land holdings were reduced from about 138 million acres to only 48 million acres. *Tribal Self-Government*, 70 Mich.L.Rev. at 960. Destruction of the tribal land base in turn proved successful in reducing tribal control over internal affairs to almost a nullity. *Id.* at 959.

The 1920's and 1930's saw a gradual change of attitude in those controlling federal policy toward Indians. Cohen, supra, at 144. Respect for many traditional aspects of Indian culture became evident. *Id.* Among others, John Collier, then Commissioner of Indian Affairs, called for the preservation of Indian heritage and the revival of tribalism, in large part though tribal ownership of land. *Id.* at 146.

In 1934, this change of attitude found expression in the IRA, an act intended to promote tribal self-government and conserve Indian lands and resources. *See* Indian Reorganization Act, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461–479). "The Act was intended to stop the alienation of tribal land needed to support Indians, and to provide for acquisition of additional acreage for tribes." Cohen, supra, at 147.

It was in this context that Congress empowered Section 16 entities "to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." 25 U.S.C. § 476. While Congress may have had before it the specific problem of appropriation of Indian assets by the Secretary of the Interior, the broad terms in which it legislated indicate that it intended to protect Indian assets from other, similar threats as well. It intended to stop erosion of the tribal land base in whatever form that erosion took.

The language of 25 U.S.C. § 476 appears to protect NEC's lots from foreclosure by the City. The purpose for which this provision was enacted is clear; application of the provision to foreclosure proceedings will further that purpose. If any doubt remained, this court would rest on the settled principle that, in Indian law, all ambiguities must be resolved in favor of the Indians. *See Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp. 1127, 1140 (D.Alaska 1978).

Section 16 of the IRA bars the City from foreclosing on NEC lands without the consent of NEC.

### 2. NEC Did Not Consent to Foreclosure by the City.

The City contends that, even if the IRA bars it from foreclosing on NEC's lands without NEC's consent, NEC consented to the foreclosure. It offers two arguments on this issue.

First, the City argues that a provision of NEC's constitution limiting NEC's powers to those "which are not against Federal law and such Territorial law *as may apply*" (emphasis added) constitutes consent to comply with state tax and foreclosure laws.

This argument is without merit. By barring transfer without NEC's consent, Congress has determined that state law permitting foreclosure *does not apply*.

Second, the City argues that if NEC fails to redeem the property within the statutory period, it will have consented to transfer of the land.

This argument too is without merit. The City offers no basis for so broadly reading the word "consent."

NEC did not consent to transfer of its lots.[4]

## B. NEC IS NOT A PUBLIC INTEREST LITIGANT.

█ NEC contends that it is a public interest litigant. If NEC is a public interest litigant, it may be entitled on remand to full reasonable attorney's fees, rather than partial fees. *See Alaska Survival v. State, Dep't of Natural Resources*, 723 P.2d 1281, 1292 (Alaska 1986).

Criteria for applying the public interest exception to an award of attorney's fees were articulated by this court in *Southeast Alaska Conservation Council v. State*, 665 P.2d 544, 553 (Alaska 1983):

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

(4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance?

Applying these criteria, the court below concluded that NEC was not a public interest litigant. This court may review the conclusion of the court below only for abuse of discretion. *See Cooper v. Carlson*, 511 P.2d 1305 (Alaska 1973).

Regardless of whether a case involves issues of general importance, a person who stands to receive substantial economic benefit from a favorable resolution of his claim likely will not be deterred from bringing that claim by the prospect of an adverse award of attorney's fees. *See Sisters of Providence v. Department of Health*, 648 P.2d 970, 979–80 (Alaska 1982). We must weigh the possible economic benefits of a favorable outcome against the deterrent effect of possible fee award.

In 1985, the total tax burden on NEC's lots was $4,240. Assuming a 10 percent annual interest rate, the present value to NEC of not paying taxes for the years 1982–88 is about $28,000; the present value of not paying taxes over the next 20 years (assuming the tax burden on the lots remains the same) is about $35,000. Thus, NEC's potential "recovery" of over $63,000 substantially exceeds the $8,500 in attorney's fees awarded below.

NEC would have had sufficient economic incentive to file suit even if the action had involved only narrow issues lacking general importance.[5] The court below did not abuse its discretion in concluding that NEC was not a public interest litigant.

## III. CONCLUSION

Section 16 of the IRA bars the City from foreclosing on NEC's lands without NEC's consent. NEC did not consent to foreclosure. Therefore, the trial court erred in denying NEC's motion to dismiss the City's foreclosure action as to NEC's lots.

The trial court did not err in concluding that NEC is not a public interest litigant.

The judgment of the superior court is AFFIRMED in part, REVERSED in part and REMANDED for proceedings consistent with this opinion.

RABINOWITZ, Justice, dissenting.

I dissent from the court's holding that section 16 of the Indian Reorganization Act (IRA), 25 U.S.C. § 476, bars the City of Nome from foreclosing on the three lots owned by the Nome Eskimo Community.

---

**4.** Because the case is resolved on this ground, we do not consider other arguments raised by NEC.

**5.** NEC satisfies the other three criteria of the public interest test.

As to the first criterion, NEC's suit is designed to effectuate the strong public policy of preserving Native lands and heritage.

The second criterion is also satisfied: Natives throughout the state may benefit from our determination of this issue.

The City concedes that the third criterion is satisfied.

As this court noted in *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 39–40 (Alaska 1988):

> When the IRA was initially passed in 1934, section 16 but not section 17 was applicable to Alaska. Since section 16 was limited to a tribe or tribes residing on a reservation and Alaska had few reservations, its applicability was quite limited. This was changed by the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936), which in section 1 extended section 17 and some other sections of the IRA to Alaska with the following proviso:
>
> > PROVIDED, That groups of Indians in Alaska are not recognized prior to May 1, 1936 as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district, may organize to adopt constitutions and by-laws and to receive charters of incorporation and federal loans under §§ 10, 16, and 17 ... of the [IRA].
>
> ....
>
> The proviso language of section 1 of the Alaska Indian Reorganization Act "assumed that Alaska Natives were not members of federally recognized Indian Tribes...." It was thus an express congressional statement applicable to most Native groups in Alaska that they had not been recognized as tribes.

(Footnotes and citation omitted.)

In 1939 the Nome Eskimo Community was organized under section 16 of the IRA and the proviso of section 1 of the Alaska IRA. In its decision in the instant case the superior court found that "The Community did not then form a corporation under Section 17 of the Act, ... and instead became a non-profit corporation under the State laws of Alaska." In the late 1970's and early 80's the Nome Eskimo Community purchased three lots in fee simple within the city boundaries of Nome. As to these lots the superior court specifically found that "[t]he Nome Eskimo Community pur- chased the above properties and owned them in fee simple. Title to the properties was not taken in the name of the United States, nor in trust for the Nome Eskimo Community under the provisions of Federal Law." The superior court additionally observed that it was "questionable whether it [the three lots] were conveyed to the Nome Eskimo Community as a nonprofit corporation under State law or whether it was conveyed to them under Section 16 of the IRA."[1]

One of the three lots is devoted to the operation of a commercial freezer plant and cold storage facility, "where people rent freezer space and there's a butchering room." The other two lots form a parcel which is the situs of the Nome Eskimo Community's "administrative offices, meeting halls, and workshop." The Community also conducts Bingo games from the premises. The superior court further found that both the freezer plant and the Bingo hall are open to the public.

It is against this background that we are asked to decide whether Congress, in enacting section 16 of the IRA and the proviso portion of section 1 of the Alaska IRA, intended to prohibit valid foreclosure proceedings under state law against IRA tribal assets. Looking first to the text of section 16 of the IRA, it is not at all clear that the language "to prevent the sale, disposition, lease, or encumbrance of tribal lands, interest in lands or other tribal assets without consent of the tribe" is reflective of an intent on Congress' part to immunize entities such as the Nome Eskimo Community from state-authorized foreclosure proceedings. Analysis of the legislative history of section 16, which is set forth in the majority's opinion, persuades me that in enacting section 16 Congress entertained a specific, narrow purpose—to stop the then prevalent Indian Service practice of appropriating tribal lands or selling tribal assets to pay the Indian Service's routine administrative costs.[2]

In short, there is no evidence that the authorization contained in section 16 to

---

1. I assume for purposes of this dissent that the lots in question were conveyed to, and held by, the Nome Eskimo Community under section 16 of the IRA.

2. I am of the further view that Senator O'Maho-

IRA tribes and tribal councils to "prevent the sale, disposition, lease, or encumbrance of tribal lands, interest in lands, or other tribal assets without consent of the tribe" was intended by Congress to immunize such lands and assets from execution pursuant to state law.

Although I fully subscribe to the canon of construction that all ambiguities in fed-

ney's interpretation of the section is questionable since there is nothing in the relevant legislative history of section 16 to indicate that there was a possibility or problem of individuals selling tribal assets. Nor does Senator O'Mahoney's interpretation justify a broad immunity from execution of money judgments.

3. In regard to construction of our statutes we said the following in *State v. Alex*, 646 P.2d 203, 208 n. 4 (Alaska 1982):

In a long line of cases prior to 1978 this court had reaffirmed its reliance on the "plain meaning" rule in interpreting enacted law. *Poulin v. Zartman*, 542 P.2d 251, 270 (Alaska 1975) *on rehearing*, 548 P.2d 1299; *Roderick v. Sullivan*, 528 P.2d 450, 453–55 (Alaska 1974); *Alaska Public Employees Ass'n v. State*, 525 P.2d 12, 14, 15 (Alaska 1974); *State v. City of Anchorage*, 513 P.2d 1104, 1109 (Alaska 1973); *Homer Electric Ass'n v. City of Kenai*, 423 P.2d 285, 289 n. 22 (Alaska 1967); *Application of Babcock*, 387 P.2d 694, 696 (Alaska 1963); *Alaska Mines & Minerals, Inc. v. Alaska Indus. Bd.*, 354 P.2d 376, 379 (Alaska 1960). The rule stated, "[w]here the meaning of a statute is apparent, there is no need to resort to methods of statutory construction." *White v. Alaska Ins. Guaranty Ass'n*, 592 P.2d 367, 369 (Alaska 1979).

However, in the recent case of *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 n. 7 (Alaska 1978), we expressly "reject[ed] the so-called 'plain meaning' rule as a strict exclusionary rule." We then went on to draw an analogy between the use of the plain meaning rule in the interpretation of enacted law and the former rule for the interpretation of contracts where a preliminary finding of ambiguity was required before extrinsic sources could be consulted. *Id.*

Despite the *North Slope* decision, several of our subsequent cases have nevertheless applied the mechanical plain meaning rule. *Horowitz v. Alaska Bar Ass'n*, 609 P.2d 39, 41 (Alaska 1980); *City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 635 (Alaska 1979); *White v. Alaska Ins. Guaranty Ass'n*, 592 P.2d 367, 369 (Alaska 1979); *Hafling v. Inland*

eral legislation pertaining to Native Americans should be resolved in favor of the Native American, I think the majority's construction of section 16 is incorrect in light of the ·relevant legislative history.[3] Given this conclusion on my part I believe the court should address the remaining significant legal points which have been advanced by the Nome Eskimo Community

*Boatmen's Union of the Pacific*, 585 P.2d 870, 872 (Alaska 1978).

The true issue in interpreting enacted law is the conflict between the meaning the enacting body intended and the meaning conveyed to others. 2A Sutherland, Statutory Construction § 48.02, at 18–5 (4th ed. 1973). The conflict is between what the sender meant and what the receiver understands. *Id.* § 45.08, at 22. The "plain meaning" rule has its basis in this conflict. Obviously, there are elements of unfairness where legislative intent is used to vary the apparent meaning of statutory words. *Id.* § 48.02, at 185–86. This has led some members of the judiciary to reject completely the consideration of legislative intent. Justice Holmes once remarked that "we do not inquire what the legislature meant; we ask only what the statute means." *Id.* § 45.07, at 20. On the other hand, most decisions speak in terms of legislative intent as if nothing else mattered in interpretation. *Id.*

Neither extreme expressed above provides a realistic and workable approach to the reconciliation of the intent and meaning approaches to the interpretation of enacted law. Part of the problem stems from ambiguity being a relative concept. Words have no intrinsic meaning; what is clear to one person is ambiguous and obscure to another. *Id.* § 45.02, at 4–5. As one court stated: "We think the statute is plain on its face, but since words are necessarily inexact and ambiguity is a relative concept, we now turn to the legislative history, mindful that the plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.1973), *cert. denied* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147. In our recent decision of *State v. City of Haines*, 627 P.2d 1047, 1049 n. 6 (Alaska 1981), we interpreted *North Slope* as having adopted just such a sliding scale approach as articulated in *United States Steel.* Our cases listed above are therefore no longer authoritative to the extent that they hold for a mechanical application of the plain meaning rule.

*See also: City of Homer v. Gangl*, 650 P.2d 396, 400 n. 4 (Alaska 1982).

for reversal of the superior court's judgment.