LAW OFFICES OF VINCENT VITALE, P.C., and Vincent Vitale, Appellants/Cross–Appellees,

v.

Bertha Mae TABBYTITE, and the Municipality of Anchorage, Appellees/Cross–Appellants.

Nos. S–7351, S–7542.

Supreme Court of Alaska.

July 25, 1997.

Rehearings Denied Sept. 5, 1997.*

---

* RABINOWITZ, Senior Justice Pro Tem, dissents in part; he would grant Vitale's petition for rehearing.

Vincent Vitale, Anchorage, for Appellants/Cross–Appellees.

Tony Strong, Law Offices of Tony Strong & Associates, Juneau, for Appellees/Cross–Appellants.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

Federal statute 25 U.S.C. § 410 (1994) insulates from the reach of creditors proceeds from the sale or lease of Indian allotment lands. A road which became public was illegally built on Bertha Mae Tabbytite's allotment. More than two decades later, the land on which the road was located was formally taken in condemnation proceedings and a money judgment in her favor was entered. The main question in this case is whether the proceeds from this judgment are protected under section 410. We answer in the affirmative because we conclude that the judgment is money accruing from an involuntary lease and sale of Tabbytite's land.

### II. FACTS AND PROCEEDINGS

Bertha Mae Tabbytite owns a 160–acre Indian allotment in the Chugach Mountains in Anchorage. In 1958 Glen Clarke constructed a road across Tabbytite's property without any right to do so. Clarke transferred the road to the City of Glen Alps. Glen Alps was eventually annexed by the Municipality of Anchorage.

Litigation prompted by the road began in 1969 when the United States, joined by Tabbytite as an intervener, sued to enjoin the use of the road and sought trespass damages. The course of the litigation can be traced through *United States v. Clarke,* 529 F.2d 984 (9th Cir.1976); *United States v. Clarke,* 590 F.2d 765 (9th Cir.1979); and *United States v. Clarke,* 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980). In the case last cited,

the Supreme Court of the United States held that the Municipality could not acquire the road by inverse condemnation.

The Municipality then brought a formal condemnation action to acquire the road. Ten years after it was filed, the case was tried in the United States District Court for the District of Alaska. The court awarded Tabbytite damages of $165,962, consisting of four items:

(1) Value of the property on which the road is constructed—$13,162;

(2) Value of the road as constructed (separate from the value of the bare land)—$60,000;

(3) Fair rental value of the bare land on which the road is built from the date of first Municipal occupancy until condemnation—$13,000; and

(4) Fair rental value of the road as constructed (separate from the rental value of the bare land)—$79,800.

Both the Municipality and Tabbytite appealed from the condemnation award. The Ninth Circuit rejected the arguments of both parties and affirmed the award on September 23, 1992.

Between 1976 and 1980, Vincent Vitale acted as counsel to Tabbytite in connection with the litigation described above. In 1980 Tabbytite terminated the lawyer-client relationship. Prior to his termination, Vitale filed an attorney's lien seeking security for payment of his fees from litigation proceeds. After the Ninth Circuit affirmed the condemnation award, the Municipality owed Tabbytite, including interest and less sums previously deposited, $197,460. The Municipality did not believe that it could deliver this sum to Tabbytite without risking double liability because it was aware of Vitale's lien claim. It therefore filed a complaint for interpleader in the superior court against Tabbytite and Vitale. Alleging that it had no interest in the funds but that it was exposed to possible double liability, the Municipality requested the adjudication of the validity of the conflicting claims of Tabbytite and Vitale.

Vitale answered the interpleader complaint and asserted a cross-claim against Tabbytite, seeking enforcement of his attorney's lien. Tabbytite responded by filing a fee arbitration petition under Alaska Bar Rule 39. Tabbytite petitioned to stay the interpleader action under the automatic stay provisions of Alaska Bar Rule 39(b). The superior court granted this petition. Thereupon the focus of the parties shifted to the fee arbitration.[1]

The fee arbitration panel reached its decision on March 15, 1995. It awarded Vitale $64,375, representing the present value of fair and reasonable compensation for his services to Tabbytite. Vitale then moved in the interpleader action for an "Order Confirming and Reducing to Judgment" the arbitration award and for a final judgment and disbursement of the interpled funds.

Tabbytite opposed this motion and moved for dismissal of the action. One ground which she asserted in her opposition and in support of her motion to dismiss was based on 25 U.S.C. § 410, which provides as follows:

No money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in case of a minor, during his minority, except with the approval and consent of the Secretary of Interior.

After much additional briefing, the superior court entered an order dismissing the case, reasoning that it was divested of subject matter jurisdiction by the application of 25 U.S.C. § 410. Finding that the condemned land was held in trust on dates pertinent to section 410, the court wrote:

[T]his court concludes that a condemnation is a sale, albeit a forced one. See *Jackson v. New York*, [213 N.Y. 34,] 106 N.E. 758 (N.Y.1914), in which Justice Cardozo said: " '[c]ondemnation' is an enforced sale, and the state stands toward the owner as a

---

1. This was interrupted by Tabbytite's subsequent removal of the interpleader to federal court. The United States District Court for the District of Alaska remanded the case to the state superior court on motion of Vitale, which was not opposed by Tabbytite. The court stated: "It appears that removal was not timely and that it is doubtful that any federal question exists."

buyer toward a seller." But, if there be any doubt on the issue, the doubt should be resolved in favor of defendant Tabbytite under the well recognized principle that when a statute affecting Indian rights is ambiguous the ambiguities must be resolved in favor of the Indian. *Bryan v. Itasca County*, 426 U.S. 373, 392[, 96 S.Ct. 2102, 2112–13, 48 L.Ed.2d 710] (1976). Finally, this Court's determination that condemnation proceeds are protected by 25 U.S.C. 410 furthers the intent of the statute which is to protect revenue generated by Indian trust land. *Squire v. Capoeman*, 351 U.S. 1[, 76 S.Ct. 611, 100 L.Ed. 883] (1956).

The court dismissed the action and ordered the interpled funds returned to the Municipality of Anchorage. Subsequently, Tabbytite moved for attorney's fees and costs. This motion was denied for the stated reason that the court lacked subject matter jurisdiction over the underlying dispute.

Vitale appeals. On appeal he raises essentially three arguments. First, he argues that he was entitled to a personal judgment against Tabbytite based on the arbitration award. Second, he contends that section 410 did not divest the superior court of jurisdiction. And third, he argues that section 410, for a number of reasons, does not apply to the interpled funds.

Tabbytite has filed a cross-appeal from the court's failure to award her attorney's fees and costs. We proceed to address the parties' arguments.

2. Bar Rule 40(t) provides:

> **Confirmation of an Award.** Upon application of a party, and in accordance with the provisions of AS 09.43.110 and AS 09.43.140, the superior court will confirm an award, reducing it to a judgment, unless within ninety days either party seeks through the superior court to vacate, modify or correct the award in accordance with the provisions of AS 09.43.120 through 140.

3. 25 U.S.C. § 82 provides:

> **Payments under contracts; aiding in making prohibited contracts.** No money shall be paid to any agent or attorney by an officer of the United States under any such contract or agreement, other than the fees due him for

## III. DISCUSSION

### 1. Was Vitale Entitled to a Personal Judgment Based on the Fee Arbitration Award?

We answer this question in the affirmative. Bar Rule 40(t) requires the superior court to confirm an award and reduce it to judgment upon the application of a party unless either party has timely sought to vacate, correct or modify it.[2] Tabbytite advances two grounds in opposition.

██ First, she claims that 25 U.S.C. § 82 (1994) prohibits Vitale from enforcing any personal contract with Tabbytite without approval of the Secretary of the Interior.[3] Section 82 applies to agreements "made by any person with any tribe of Indians, or individual Indians not citizens of the United States...." 25 U.S.C. § 81 (1994). The application of section 82 to individual Indians currently has little, if any, force, since it is limited to Indians who are not citizens of the United States. Tabbytite makes no claim that she is not a United States citizen, and therefore she is not entitled to the protection of section 82.

██ Second, Tabbytite presents an argument the caption of which states: "The Findings of the Panel Are Based on Fraud." The entire argument presented under this caption is as follows:

> Ms. Tabbytite asserts that the findings of the Fee Arbitration Panel are based on incorrect information. Ms. Tabbytite asserts that Mr. Vitale waived any fee when he voluntarily withdrew from the underly-

services rendered thereunder; but the moneys due the tribe, Indian, or Indians, as the case may be, shall be paid by the United States, through its own officers or agents, to the party or parties entitled thereto; and no money or thing shall be paid to any person for services under such contract or agreement, until such person shall have first filed with the Commissioner of Indian Affairs, a sworn statement, showing each particular act of service under the contract, giving date and fact in detail, and the Secretary of the Interior and Commissioner of Indian Affairs shall determine therefrom whether, in their judgment, such contract or agreement has been complied with or fulfilled; if so, the same may be paid, and, if not, it shall be paid in proportion to the services rendered under the contract.

ing federal case cited above. She has been consistent and persistent on that point. Furthermore she is insistent that Mr. Vitale's claims are not recognizable in State Court. Ms. Tabbytite respectfully requests this Court to affirm the dismissal. Under AS 09.43.120(a) an arbitration award can be vacated if it was procured by fraud.

▆▆▆ Tabbytite's argument in her brief on appeal is an almost verbatim reproduction of the argument she made in opposition to the motion to confirm the award before the trial court. No instance of fraud is specified in this argument. Fraud, in fact, is not mentioned. Fraud, even in an initial pleading, must be averred with particularity. Alaska R. Civ. P. 9(b). It follows that a confirmation award may not be resisted merely by reciting without specificity that fraud existed. Further, at the motion stage, evidentiary support for particular fraud claims must be presented. *See, e.g.,* Alaska R. Civ. P. 56(c); *McHugh v. Church,* 583 P.2d 210, 217 (Alaska 1978). We conclude therefore that Tabbytite did not present a legally sufficient claim of fraud as a defense to the motion to confirm. Further, given her briefing as set forth above, if she had presented such a defense it would be waived on appeal because of inadequate briefing. *See Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991); *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980).

### 2. Did the Superior Court Have Subject Matter Jurisdiction?

▆▆▆ We answer this argument in the affirmative as well. Even if 25 U.S.C. § 410 bars imposing liability on the proceeds of the condemnation action, nothing in section 410 excludes state court jurisdiction. Section 410 does not purport to make federal jurisdiction exclusive. Where a federal statute is silent on the question of jurisdiction, state and federal courts have concurrent jurisdiction. *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 506–08, 82 S.Ct. 519, 522–23, 7 L.Ed.2d 483 (1962); *Paul v. Nauska,* 395 P.2d 260, 262–63 (Alaska 1964). Indeed, a state court

of general jurisdiction may not refuse to hear a case brought under a federal statute unless it also lacks jurisdiction to hear state cases of the same type. *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *E.A. v. State,* 623 P.2d 1210, 1215 n. 13 (Alaska 1981). Thus the superior court had jurisdiction to decide the application of section 410 to the proceeds in question here.

Because we hold that the superior court had jurisdiction, we need not address Vitale's arguments regarding various permutations of the doctrine of *res judicata.* Similarly, his arguments that Tabbytite waived her jurisdictional objections are mooted.

### 3. Does Section 410 Apply to the Proceeds of the Condemnation Case?

▆▆▆ We answer this question in the affirmative for the reasons expressed by the superior court.[4] Section 410 is designed to exempt certain Indian property from liability for the payment of certain debts. In *Matter of City of Nome,* 780 P.2d 363, 367 (Alaska 1989), we noted that a federal statute designed to protect from creditors certain categories of Indian property should be construed broadly: "ambiguities must be resolved in favor of the Indians." *Id.*

▆▆▆ An award of compensation for land which is forcibly conveyed in a condemnation action can readily be categorized as money accruing from a sale of the land in question. As Judge Cardozo put it, " 'Condemnation' is an enforced sale, and the state stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined." *Jackson v. State,* 213 N.Y. 34, 106 N.E. 758, 758 (1914); *see also, United States v. 27,223.21 Acres of Land,* 589 F.Supp. 1121, 1124 (D.Colo.1984); *Herskovitz v. Vespico,* 238 Pa.Super. 529, 362 A.2d 394, 397 (1976).

Similarly, damages for the precondemnation use of land are analogous to lease proceeds. The court in the condemnation case calculated damages for the precondemnation use of Tabbytite's land based on its fair rental value:

---

4. Vitale does not argue that Tabbytite's land is not land held in trust by the United States for

any Indian; thus we assume that Tabbytite's land is within the coverage of section 410.

The fair rental value of the road, from the time the City began its occupancy, to the time the City condemned the road, was $13,000. This compensates Ms. Tabbytite for the fair market value of the City's use during the time that the City did not pay rent for the land upon which the road was built. *This is the rent value of the bare land,* not including the improvement.

The City had the advantage of the improved road, which had been conferred as an unwanted benefit by Clarke onto Tabbytite's land, for nineteen years, from 1961 to 1980. The fair rental value of the bare land during this time must be increased by the rental value of the improvement. *I find that a fair measure,* roughly in accord with market values, *for a lease of the improvement* subject to maintenance by the Municipality as tenant, would be 7% per year of what it cost to build the road, $60,000, times 19 years, for a rent on the improvement of $79,800. *This is for rent value of the improvement,* independently of the rent value of the bare land.

(Emphasis added.) Just as Tabbytite can be said to have involuntarily sold a portion of her land and received proceeds for the sale in the condemnation action, it is reasonable to conclude that the use of the same land prior to the formal condemnation action was an involuntary leasing and the damages for that use were lease accruals.

Vitale argues that trespass damages are not the equivalent of proceeds from a forced lease. He points out that damages for trespass may include amounts for emotional distress suffered by the owner and for physical harm to the land and that such amounts would not take on the character of lease proceeds. We need not decide whether trespass damages are equivalent to lease proceeds in every case. In this case there is no doubt that the entire amount of the damage award for trespass was based on the precondemnation use of the land measured by its rental value. The award thus had the character of lease proceeds. *See* Restatement (Second) of Torts § 931 cmt. b & illus. 1 (1979).

 We conclude, for the above reasons, that all of the proceeds from the condemnation action reasonably can be considered to have accrued from the lease or sale of allotment lands. The proceeds thus fall within the protection of section 410.[5]

 Vitale contends that, even if the proceeds here are protected by section 410, attorney's fees arising from work performed to protect allotment rights are excepted from the section's bar. As support for this position he cites *Arenas v. Preston,* 181 F.2d 62 (9th Cir.), *cert. denied,* 340 U.S. 819, 71 S.Ct. 50, 95 L.Ed. 602 (1950).

In *Arenas,* the Ninth Circuit allowed an attorney's lien to be placed on an Indian allotment despite the inalienability of that land. *Id.* at 66–67. In doing so the court reasoned that such a course of action would, in effect, serve the congressional purpose of affording extra protection to Native allotments. *Id.* at 66. That is, without the services of the attorney the Indian would not have received his allotment at all. *Id.* Vitale urges this court to apply this same doctrine to proceeds protected by section 410.

While the matter is not free from doubt, we think that *Arenas* is not controlling. Section 410 is neither mentioned nor discussed in the *Arenas* opinion. Given that section 410 applies, we are not free to decide this case based on the rationale underlying *Arenas,* because that rationale conflicts with the explicit command of the statute.[6]

**5.** Vitale's argument regarding the fact that, at the time his services were rendered, there had been no sale or lease of the land in question and that, therefore, section 410 is inapplicable, is without merit. Section 410 proceeds are exempt from all claims arising during the period the land is held in trust, regardless of the relationship in time between the accrual of the claim and the sale or lease. Vitale's argument that applying section 410 unconstitutionally impairs his contract rights is also without merit. It is inconceivable that the inability to levy on a specific fund to satisfy a debt unconstitutionally impairs a contract underlying the debt when the bar on levying pre-exists the making of the contract. Vitale's *ex post facto* argument is similarly misguided. Section 410 was enacted in 1906. *See* 25 U.S.C. § 410. He rendered his services seventy years later.

**6.** Further, textual adherence to section 410 does not necessarily mean that indigent allotment holders cannot obtain effective representation. At least in some circumstances, as the facts in this case illustrate in part, the Department of

4. *Did the Trial Court Err in its Denial of Attorney's Fees?*

Tabbytite argues on cross-appeal that the superior court should have awarded her attorney's fees under Civil Rule 82 because she was the "prevailing party." The superior court declined to award attorney's fees because it had ruled that it possessed no subject matter jurisdiction. Because we hold that the superior court had jurisdiction, we also direct that court to consider the issue of attorney's fees on remand. The superior court must, of course, determine who is the prevailing party before awarding fees.

## IV. CONCLUSION

The dismissal of this case for lack of subject matter jurisdiction is REVERSED. This case is REMANDED for (1) entry of a personal judgment in favor of Vitale, (2) entry of judgment awarding the interpled funds to Tabbytite, (3) determination of the prevailing party and an award of attorney's fees to such party, and (4) such other and further relief as may be appropriate.

RABINOWITZ, J., with whom COMPTON, C.J., joins, dissents.

RABINOWITZ, Justice, with whom COMPTON, Chief Justice, joins, dissenting.

I cannot agree with a construction of 25 U.S.C. § 410 that effectively leaves indigent Natives without access to legal counsel when challenging a trespass to their allotment lands. I therefore dissent from Section III.3 of the court's opinion.

By its terms, § 410 immunizes proceeds from the "sale or lease" of a restricted Indian allotment. The principal question posed by this appeal is thus whether Tabbytite's trespass and condemnation judgment constitutes the proceeds of a "sale or lease."

The court relies on the fact that "[a]n award of compensation for land which is forcibly conveyed in a condemnation action can readily be categorized as money accruing from a sale of the land in question" and "damages for the precondemnation use of land are analogous to lease proceeds" to hold that Tabbytite's award is protected. The difficulty with this approach is not that the court has given the wrong answer, but that it has asked the wrong question. In my view, this case does not require an inquiry into the essence of a lease, or an investigation into whether their inherent natures include a condemnation award. Obviously, sale and lease proceeds and condemnation awards share similarities and differences. Whether it is the similarities or the differences which predominate will depend on the circumstances of the particular case. For some purposes, it is the similarities which are relevant. Thus Justice Cardozo has concluded that the lease value of land is a handy measure of the damages to be awarded upon condemnation. *Jackson v. State,* 213 N.Y. 34, 106 N.E. 758 (1914). The United States District Court followed this approach when calculating Tabbytite's award. However, the fact that an analogy was useful does not mean that condemnation is the equivalent of a sale or lease in all circumstances and for all purposes. In each case, whether the simile is appropriate will depend on the ends to be served by the rule being applied.

Here we must ask whether treating a trespass as a lease is consistent with the policies underlying § 410. That statute was intended to preserve the financial security afforded to an individual Indian by an allotment. Preventing Vitale from asserting his attorney's lien obviously increases the amount of allotment-derived money that Tabbytite will retain. Thus the court cites *Matter of City of Nome,* 780 P.2d 363 (Alaska 1989), where we invoked the rule that ambiguities in a statute are to be resolved in favor of the Indians. *See id.* at 367.

I endorse the rule, *see id.* at 370 (Rabinowitz, J., dissenting), but not the way it has been applied here. An outcome that is favorable for the individual Indian litigant may not always be beneficial for Indians as a group. Indeed, sometimes the interests will conflict. So much was acknowledged by the Supreme Court of the United States in *Negonsott v. Samuels,* 507 U.S. 99, 110, 113 S.Ct. 1119,

Justice provides representation to allotment holders. Moreover, we cannot assume that the

Secretary of the Interior will unreasonably disapprove of reasonable fees under section 410.

1125–26, 122 L.Ed.2d 457 (1993), when it rejected the appeal of an Indian defendant charged with shooting another Indian on a reservation. The defendant challenged the state's assertion of criminal jurisdiction under the Kansas Act, arguing that the Act should be construed in his favor (and against state jurisdiction). *Id.* at 104, 113 S.Ct. at 1122–23. The court rejected such an approach, finding "no reason to equate 'benefit of dependent Indian tribes' ... with 'benefit of accused Indian criminals,' without regard to the interests of the victims of these crimes or of the tribe itself." *Id.* at 110, 113 S.Ct. at 1125 (quoting *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976)). In other words, what is beneficial for the individual Indian will not always be good for the tribe. When interpreting a federal Indian statute, the first question to ask must always be which construction is consistent with the policies animating the legislation, in light of the federal government's trust relationship toward Indians. *See United States v. Mitchell,* 463 U.S. 206, 226, 103 S.Ct. 2961, 2972–73, 77 L.Ed.2d 580 (1983); *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). *See also* Reid Peyton Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians,* 27 Stan. L.Rev. 1213, 1214–15 (1975).

Here there can be no argument that preventing Indians from entering into enforceable contingent fee agreements to protect their interests in allotments is at cross purposes with the allotment statutes. In this regard, I find the Ninth Circuit's reasoning in *Arenas v. Preston,* 181 F.2d 62 (9th Cir. 1950), compelling. That case addressed whether 25 U.S.C. § 345, which authorizes a suit by an Indian to acquire an allotment, also precludes enforcement of a lien on the property by the litigating attorney. *Id.* at 66. The court had no difficulty dismissing such a construction, noting that:

> When the United States authorized [actions for allotments], it did so knowing that the Indian by himself was incapable of taking advantage of the privilege and that attorney fees and other expenses would be

the unavoidable concomitant. It also knew that the Indian litigant, with few exceptions, was without the means to meet the necessary expenses. It seems to us that Congress could not have intended to commit the subject to its courts with any paralyzing limitation but, in committing the subject to its courts it intended them to fully exercise their general equitable jurisdiction [to enforce attorney's fee agreements].

*Id.* at 66–67.

This reasoning applies with equal force in this case. By immunizing sale and lease proceeds, Congress sought to protect the Indian's interest in the allotment. But if § 410 prevents the destitute Native injured by a trespass to his or her allotment lands from entering into a valid fee agreement, it will effectively preclude the Indian from protecting his or her interest in the property. Few attorneys will assume the risk of taking on the suit when even a successful outcome offers no guarantee of remuneration. Indeed, were today's ruling already fixed as precedent when Tabbytite first approached Vitale in 1976, he too might well have declined to take her case. Tabbytite lacked the resources to pay an attorney out of her own pocket; her only means of inducing Vitale to represent her was by promising him a portion of a potential judgment. By declaring that agreement unenforceable, the court's decision will inevitably prevent future Tabbytites from securing counsel in like cases. Section 410 cannot be construed in a way that defeats its own ends, that undermines the Indian's ability to defend his or her interest in the allotment. I would hold that Vitale may enforce his lien against Tabbytite's condemnation award.[1]

---

1. I agree with Sections III.1 and 2 of the court's opinion.